# Leigh *v.* The State, *ex rel.* O'Bannon.

*Application for Mandamus to Contest Election held to locate County Site.*

| 69 | 261 |
|----|-----|
| 97 | 108 |

| 69 | 261 |
|-----|-----|
| 100 | 649 |

| 69 | 261 |
|-----|-----|
| 126 | 613 |
| 126 | 614 |

1. *Supervisors of election; their powers and duties.*—The board of supervisors under the election law (Code of 1876, § 292) have no revisory powers, but their duties are purely ministerial and are confined to mere computation. They are governed by the returns made by the inspectors of the several precincts as to the number of votes cast, and for whom cast; and if these returns be in form, they have no power to go behind them and ascertain the qualifications of the voters; but they must add together the votes of the several precincts cast for each candidate, as the same are shown in the certified returns, and declare the result; and the declaration of the result made by them establishes a *prima facie* case of election.

2. *Provisions for contest in general election law; when applicable.*—The act of the General Assembly, approved February 18th, 1881 (Pamph. Acts, 1880–81, p. 220), authorizing an election for the purpose of permanently locating the county site of Escambia county, makes no provision for a contest of the election to be held thereunder; and as the provisions of the general election law regulating contests of election (Code, 1876. §§ 302–41), being confined to election of persons to office, are not applicable, there is no provision made by the statutes for a contest of such an election.

3. *Mandamus; how affected by statute.*—*Mandamus* as a remedial process, remains as it was at common law, a writ for the enforcement of a clear legal right, for which there is no other adequate legal remedy, except that the statutes (Code of 1876, § 3601; Pamph. Acts, 1878–9, p. 150), have provided authority to controvert the truth of the return, and the machinery therefor. The purpose of these statutes was not to enlarge the scope of the operation of the writ, but merely to cure the delay consequent on the want of authority to controvert the return to the rule *nisi*.

4. *Same; to contest the declared result of an election, not within the scope of its operation.*—The result of an election held under an act of the General Assembly, authorizing an election for the purpose of permanently locating the county site of Escambia county, as declared by the

board of supervisors, can not be contested by *mandamus*, although no other remedy is provided by law for such a contest.

5.    *Quo warranto ; when not a remedy to contest an election.*—The result of such an election, so declared, can not be contested by *quo warranto,* or by the statutory proceedings in the nature of a *quo warranto.*

APPEAL from Escambia Circuit Court.

Tried before Hon. JOHN P. HUBBARD.

The petition in this cause was filed in the name of the State of Alabama, by W. J. O'Bannon, E. T. Brewton and others, citizens and legal voters of Escambia County, against N. R. Leigh, John Rupert and James H. Green, the probate judge, clerk of the circuit court, and sheriff of said county, alleging that under and in pursuance of an act of the General Assembly, approved February 18, 1881, and the order of the sheriff of said county made as directed by said act, an election was held in said county on the 12th day of April, 1881, for the purpose of permanently locating the county site thereof; that on the 16th of April, 1881, respondents met at the court house of said county and counted the votes cast at said election; that the probate judge, N. R. Leigh, and the clerk of the circuit court, John Rupert, made out and forwarded to the Secretary of State a certificate to the effect that Pollard had received a majority of the votes cast at the election; and that the sheriff, James H. Green, made out and forwarded to the Secretary of State a certificate to the effect, that Brewton had received a majority of the votes cast at the election; that "gross, palpable and glaring frauds" were committed at said election in the interest of Pollard, an account of which is *given in considerable detail;* that, in fact, the town of Brewton received the majority of the votes cast; that the relators had made a demand of the respondents, that they remove their respective offices and the books and papers pertaining thereto to Brewton, but that they had refused and failed to do so.    A writ of *mandamus* was prayed to compel the respondents to remove their offices and the books, records and papers pertaining to their respective offices from Pollard to Brewton; and that they be required to keep their offices, and to transact their official business at Brewton.    An alternative writ was issued in accordance with the prayer of the petition.    The respondents, Leigh and Rupert, moved to quash the writ and petition.    Their motion was overruled by the court, and they excepted.    They then demurred to the petition, and their demurrer was also overruled.    They then filed an answer; and upon the issue of fact thus made, the cause was tried. From the view taken of the cause by this court, it is unnecessary to set out the defense made by the answer, or the evidence introduced on the trial.    The court determined and adjuged from the evidence, that, at said election, Brewton received the

majority of the legal votes cast, and was the county site of said county, and rendered judgment awarding a peremptory writ of *mandamus*, as prayed for in the petition; and from this judgment the said respondents appealed. The overruling the motion to quash, and of the demurrer, and the final judgment of the Circuit Court, are here assigned as error.

GAMBLE & PADGETT and STALLWORTH & BURNETT, for appellants.—(1). *Mandamus* will not lie when there is any other legal remedy.—*Ex parte Harris*, 52 Ala. 87; *Ex parte Thompson*, 52 Ala. 98; *Mead v. Dean*, Minor, 46; 2 Brick. Digest, p. 240, § 4; *Thomason v. The Justices*, 3 Humph. 233; High on Ex. Remedies, §§ 49–77, 18 and 19 and note. (2). There must also be a clear legal right.—*Ex parte Harris, supra; Ex parte Thompson, supra; Ex parte Echols*, 39 Ala. 698; *U. S. v. Seaman*, 17 How. 225; High on Ex. Remedies, §§ 33–39; 6 Texas, 457; 3 Texas, 88; McCrary on Elections, § 316. (3). The relators had a clear legal remedy, to-wit, *quo warranto.*—*Echols v. Dunbar*, 56 Ala. 131; *Clarke v. Jack*, 60 Ala. 271; High on Ex. Remedies, §§ 620, 57; McCrary on Elections, §§ 320, 331–3; 5 Hill, 616; 15 Minn. 455. (4). The board of supervisors acted as judges or *quasi* judges, and not as ministerial officers, and *mandamus* will not lie to reverse their former finding, however erroneous it may be. So long as the declared result of the supervisors stands, it can not be disregarded, unless absolutely void, which is not the case. The supervisors having declared that Pollard received the majority of the votes cast, it would have been unlawful for the respondents to have removed their offices to Brewton; and *mandamus* would not lie to compel them to do an unlawful act.

DAVID CLOPTON and J. WHITEHEAD, *contra.*—(1). The act of February 18, 1881, makes no provision for a contest of the election therein provided for, and the provisions of the general election law relating to contested elections, relate only to "the election of persons declared elected to any office."—*Clarke v. Jack*, 60 Ala. 271. (2). When there are common law modes of determining contested elections, and the statute providing for the election, does not inhibit a resort to the common law modes, they may be resorted to in cases for which no statutory contest is provided.—*Echols v. State, ex rel.* 56 Ala. 131. (3). The common law mode of contesting an election for the location of the county site, is *mandamus* to compel the officers to remove their offices, records, etc.—High on Ex. Remedies, § 79; *State ex rel. v. Marston*, 6 Kansas, 536; *State ex rel. v. Saxton*, 11 Wis. 27; *County of Calaveras v. Brockway*, 30 Cal. 325. (4). *Quo warranto* is the common law mode of trying the *right*

[Leigh v. The State, ex rel. O'Bannon.]

*of a person to an office*; but it is not the common law mode in such cases as the present. It does not dictate the performance of official duties, or the place or manner where, or in which they shall be performed, but inquires *into the right to perform them any where or in any manner*. It never runs to the defendants *as officers*, but *as persons*.—High on Ex. Remedies, §§ 604, 618. Besides the judgment on *quo warranto* would be ineffectual. The judgment is one of seizure, or ouster, or both. If a judgment could be rendered ousting the repondents from performing the official duties at Pollard, no judgment could be rendered commanding them to perform them *at Brewton*. High on Ex. Remedies, § 745. (5). Whenever a duty is devolved upon a public officer by law, which is ministerial, and as to which he has no discretion, *mandamus* to compel the performance of that duty has ever been recognized as the proper proceeding.—High on Ex. Remedies, §§ 31, 32, 80; *Ex parte Echols*, 39 Ala. 698; *Tenn. & Coosa R. R. Co. v. Moore*, 36 Ala. 380; *Commonwealth v Commissioners, etc.*, 37 Penn, St. 277. (6). It is manifest from the foregoing, that there is no adequate remedy; and hence is applicable the general rule, that *mandamus* will lie, where there is a clear right, and no adequate, specific remedy.

STONE, J.—By act, approved February 18th, 1881,— Pamph. Acts, 220—the qualified electors of Escambia county were "authorized to permanently locate the county site of said county by ballot." For the purpose of carrying into effect the provisions of the act, the sheriff of the county was directed to order an election to be held within sixty days after its passage, "said election to be governed, in every particular, by the election laws now in force, and the place receiving the largest number of votes shall be declared the county site of said county." It will be observed that the provisions of this statute are very brief, and it omits all details for conducting and declaring the election. It is to be governed, in every particular, by the election laws *now* in force. The election laws then and now in force declare who are qualified electors, and prescribe in what manner voters shall take the registration oath, and be registered; they also provide for the appointment of inspectors, clerks and a returning officer for each voting precinct. Only the persons who have the requisite qualifications of age, residence in the State, county and precinct, and who have been registered according to law, have the legal right to vote. The inspectors are furnished with a copy of the registration list for their precinct, and, on question raised, it is their duty to determine in the first instance who are qualified electors. They also count out the votes cast, ascertain the number of votes cast at their

box for each candidate, certify the result, and seal up the same, together with one of the poll lists certified, and a list of the registered voters in the precinct, and forward the same by the returning officer to the sheriff of the county.—Code of 1876, §§ 285-6-7.

Section 291 of the Code is in the following language: "On Saturday next after the election, at the hour of 12, meridian, the returning officer of the county, in person or by deputy, and the probate judge and clerk of the circuit court shall assemble at the court house, . . . and it shall be the duty of this board of supervisors, so constituted, to make a correct statement from the returns of the votes from the several precincts of the county, of the whole number of votes given therein for each office, and the person to whom such votes were given" Section 292: "After such statement is made, the board shall make certificates, on blanks furnished by the secretary of state, of the exact number of votes cast in their county for each person, stating the office such person is voted for, deliver the same to the judge of probate of the county," etc. It will be seen that the returning officer (who is usually the sheriff or his deputy), the judge of probate and the clerk of the circuit court, unless one or more of them fails to attend, or was a candidate at the election, constitute the board of supervisors. Their duties are defined. They must make "a correct statement from the returns of the votes from the several precincts." Their duties are purely ministerial—confined to mere computation. Though called supervisors in the statute, they have no revising powers. They are governed by the returns made by the inspectors of the several precincts, as to the number of votes cast, and for whom cast. If these be in form, the supervisors have no power to go behind them and ascertain the qualifications of the voters. They add together the several votes of the several precincts cast for each candidate, as the same are shown in the certified returns of the inspectors, and declare the result. This is a mere matter of arithmetic, and constitutes the supervisors mere canvassers.—*Hudman v. Slaughter*, at the present term. It is manifest that in the election under discussion, the supervisors were clothed with no power to hear and determine complaints of illegal registration, or illegal voting. We think it equally clear that it was alike their function and duty to declare the result, and that such declaration by them establishes a *prima facie* case of election.—*Echols v. The State, ex rel. Dunbar*, 56 Ala. 131.

The general election law of this State provides for a contest of elections. See Code of 1876, § 302, *et seq*. In *Clarke v. Jack*, 60 Ala. 271, we decided that our statutes makes no provision for a contest, in an election such as this. We adhere to

that view. In *Echols v. The State, ex rel. supra*, we ruled that *quo warranto* was the usual method of contesting the right to an office, when the statutes make no provision for a contest. We are satisfied that the declared result of the present election can not be contested by *quo warranto*, nor by our statutory proceedings in the nature of a *quo warranto.*—Code of 1876, § 3419, *et seq.* Our statutory system, and the common law writ, its prototype, have ordinarily but two functions; and the writ runs only against a natural person, or collection of natural persons. It inquires by what right the person proceeded against exercises official authority, and it determines the question of his right to exercise such authority. And it inquires by what right any number of persons, one or more, exercise or enjoy a franchise, and determines that right. The judgment either quashes, or what is the same thing, dismisses the information, or it ousts from the office or franchise. "It can afford no relief for official misconduct, and can not be employed to test the legality of the official action of public or corporate officers."—High, Extr. Leg. Rem. § 618. We have thus reached the conclusion that our statutes furnish no means of contesting the election of county site of Escambia county, and that it can not be tried on an information in the nature of a *quo warranto.*

*Mandamus* was originally a prerogative writ, issuing out of the Court of King's Bench in England, and, by construction, it was a command from the King himself, who was constructively present in that court. It issued alone from that court, for that court alone represented the ideal presence of the sovereignty.—3 Bl. Com. 110. In this country it can scarcely be called a prerogative writ. It is strictly a civil proceeding, and may be called a supplementary remedy, when the party has a clear right, and no other appropriate redress, to prevent a failure of justice.—Bouv. Dic.; *Un. Pac. R. R. Co. v. Hall*, 91 U. S. 343; Moses on Mandamus, 16, 17; 4 Wait, Actions and Defences, 357. In this State, to authorize the grant of this writ, there must be shown a clear, specific legal right, and no other adequate legal remedy.—2 Brick. Dig. 240, §§ 4, 5; *State ex rel. v. Brewer*, 61 Ala. 318; *Ex parte Schmidt*, 62 Ala. 252.

Under our statutes and rulings, there was no mode provided for controverting the truth of the return to a *mandamus nisi*, until February 26th, 1876. The return, true or false, was final for that proceeding; and the only remedy the relator had was a suit for the false return.—*Commissioners Court v. Tarver*, 21 Ala. 661; S. C. 29 Ala. 414. By act, approved February 26th, 1876—Pamph Acts, 207; Code of 1876, § 3601—it was was provided that "the truth or sufficiency of the facts or matters set forth in the answer or return in *man-*

*damus* cases, may be controverted and put in issue, and either of the parties to the cause shall have the right to demur to any pleading in the cause, or reply as many matters as may be necessary to the full and complete assertion of all his lawful and just rights in the cause, in the same manner and to the same extent as in any other civil action." There was another and fuller statute on the same subject, approved February 12th, 1879—Pamph. Acts, 150. While the later enactment provided expressly for amendments, revivor, bill of exceptions, and appeal to the Supreme Court, it did not enlarge the area of the operation of the writ, or of the grounds of contesting the return or answer. And by the ninth section it declared : "That it is not the intention of this statute to repeal the common law, as now in force in this State, in reference to any of the matters embraced in this act, but to leave the same in full force, it being the true intent and meaning of this statute to provide a more speedy, plain and less expensive mode of procedure in all cases to which it shall apply." From these principles we think it results that, with the exception of the authority to controvert the truth of the return, and the machinery therefor provided by the statutes, *mandamus*, as a remedial process, remains as it was at common law ; a writ for the enforcement of a clear legal right, for which there is no other adequate legal remedy. —*People v. Stevens*, 5 Hill (N. Y.,) 616 ; *Bonner v. State*, 7 Ga. 473 ; *People v. Detroit*, 18 Mich. 338 ; *People v. Corporation*, 3 Johns. Ca. 79 ; *People v. Supervisors*, 18 Abb. Pr. 8 ; *State v. Jacobus*, 26 N. J. L. 135 ; *State v. Warren*, 32 N. J. L. 439 ; *People v. Head*, 25 Ill. 325 ; *People v. Kilduff*, 15 Ill. 492 ; *Banton v. Wilson*, 4 Tex. 400 ; *Com. v. Sel. & Com. Council*, 34 Penn. St. 496 ; *State ex rel. v. Co. Judge*, 7 Iowa, 186 ; *State ex rel. v. Mosley*, 34 Mo. 375 ; 4 Wait, Ac. and Def. 368.

The present proceeding was instituted to compel the county officers of Escambia County to establish and keep their offices at Brewton instead of Pollard, where they are now kept. Their right to remain at Pollard, or to remove to Brewton, depends on the result of the election held to establish the county site. The supervisors, in computing the number of votes cast for each place, as shown by the certified returns of the inspectors of the several precincts. ascertained that a majority of the votes had been cast for Pollard. Being mere canvassers, and having no authority to go behind the certified returns, or to institute inquiry into the qualifications of the electors, the result was a mere matter of calculation. That ascertained result was the *statement* the law required them to certify to, and when certified it established the *prima facie* right of the place thus having a majority of the votes, to be treated and regarded as the elected court

[Leigh v. The State, ex rel. O'Bannon.]

house. We do not understand the information filed in this ·case, as denying that the certified returns of the precinct inspectors show a majority of votes cast for Pollard. The return to the rule to show cause issued in this case, shows such to have been the case. That being so, the respondents had no option. They were bound to answer truly, and so answering, they returned that the supervisors had declared the election in favor ·of Pollard. In the absence of our statutes above referred to, if that return had been made, it would have been a full answer to the rule *nisi*, and peremptory *mandamus* would have been refused. The relators could have had but one remedy—a suit against the respondents for a false return. If they had brought ;such suit, they must needs have failed, for they could not have shown that the return was false. It was true, and the only proper return they could have made. Have our statutes enlarged the operation of the writ of *mandamus?* Can it administer relief in matters theretofore without its scope? The statutes indicate no such purpose. They show, alike in their captions and in the body of them, that their purpose was to cure the delay, consequent on the want of authority to controvert the return to the rule *nisi*, They enable suitors to determine in one action, what theretofore frequently required two. We do not think they had a broader aim, or can receive a larger interpretation. They furnish no authority whatever for going behind the answer or return, and, leaping over the matter of the return, entering upon the trial of a contested election. Such contest would be beyond the scope of a *mandamus*, as al-.ways understood and administered in this State, and is equally without the purview of a controverted return. It would, in the name and form of a proceeding to compel the county offi-·cers to keep their offices at the court house, be, in substance, a hotly contested suit, to determine which of two places was and is the lawfully elected court house town. This would be to dwarf out of sight the simple issue ostensibly presented by the pleadings, in the magnitude and intricacy of the incidental inquiry, the necessities of the relief prayed make an indispensable condition precedent.—*The State ex rel. Pinney v. Williams*, at the present term.

Some rulings have been made in opposition to these views. *State ex rel. v. Marston*, 6 Kans. 524; *State ex rel. v. Saxton*, 11 Wis. 27; *County of Calaveras v. Brockway*, 30 Cal. 325. We know not under what statutory systems those decisions were made. They are not reconcilable with the uniform rulings of this court, nor with what we understand to be the function and power of a writ of *mandamus*. We are aware that in thus ruling, we leave the relators without remedy. This we regret, as the testimony tends strongly to show gross irregular-

ities in the election. We think the proof justified the finding of the Circuit Court, that Brewton received a majority of the legal votes cast; still we think the law is powerless to redress the wrong.—*O'Docherty v. Archer*, 9 Tex. 295. Better that fraud should go unpunished, than that the landmarks of the law should be obliterated or obscured.

The judgment of the Circuit Court is reversed, and, proceeding to render the judgment the Circuit Court should have rendered, this court doth order and adjudge that the information be dismissed at the costs of the relators, both in the court below and in this court.