# THE STATE ex rel. JAMES S. WAHL et al. v. EVERTON SPEER et al., Judges of County Court.

### In Banc, July 13, 1920.

1. **MANDAMUS: Pendency of Prior Suit.** Mandamus having now come to be treated as in the nature of an ordinary civil action, the pendency of a prior suit between the same parties and involving the same subject-matter constitutes a bar, unless adequate relief cannot be obtained in the prior suit.

2. ———: ———: **Parties: Different Persons But Belonging to Same Class: Jurisdiction.** Taxpayers who are plaintiffs in an injunction suit brought in the circuit court to restrain the judges and clerk of the county court from issuing the bonds of the county, and other taxpayers who are relators in the mandamus suit brought in the Supreme Court to compel the county judges and clerk to issue the bonds, belong to the same class; and in the exercise of judicial discretion, the prior suit being pleaded as a bar, the seemly course would be for the Supreme Court to withhold a peremptory writ in the mandamus suit until the suit in the circuit court has been determined, if that court has jurisdiction of the case. But the circuit court has no jurisdiction to enjoin the county court from issuing the bonds of the county on the ground that the election at which they were voted was fraudulent, and hence such pending suit, based on charges that the election was illegal, is no bar to the mandamus suit.

3. **ELECTION: Contest: County Indebtedness.** In this State, no election can be contested unless the Legislature has provided a remedy; and no method of contesting an election to remove a county seat or to authorize a county indebtedness to be contracted has been provided by statute; and by statute (Sec. 5973, R. S. 1909) an election to amend the Constitution is not contestable.

4. ———: ———: ———: **Fraud: Jurisdiction of Equity.** A court of equity has no jurisdiction to annul an election to create a county indebtedness, at the suit of taxpayers, on the ground that persons permitted to vote were not legal voters and fraud was committed at the polls. [Reviewing many cases.]

5. ———: ———: ———: ———: ———: **No Statute.** The expression in the statute (Sec. 5928, R. S. 1909) that "every court authorized to determine contested elections" implies that specific

authority must be granted to a court to try such cases, or it will not have power to do so; and the General Assembly has not vested any court with authority to determine that an election to create a county indebtedness was fraudulent.

6. ———: Fraud: General Power of Court of Equity. The rule that fraud vitiates everything wherein it is predominantly influential and that it is the province of equity to afford redress against such an influence when the common law provides no adequate remedy, is of ancient origin and carries weight in all cases in which fraud is charged; but as the Constitution commands the Legislature to designate the courts or judges by whom the several classes of election contests shall be tried and to provide the manner of trial and all matters incident thereto, and as the Legislature has not designated any court to try a contested election for the creation of a county indebtedness, and as the common law doctrine is that the result of an election if declared by the supervising officials could not be re-examined judicially, and as the judges of election in deciding whether a person who offers to vote is a qualified voter act judicially or *quasi*-judicially, a court of equity has no jurisdiction to annul such an election, even at the suit of a taxpayer.

7. ———: Different Propositions: Bonds to Build Court House. A proposition submitted to the voters of a county to issue bonds to the amount of $150,000 (a) to build a court house, (b) to equip and furnish it, and (c) to purchase more ground, if more were needed, for a suitable site for it, contained three ways in which the money could be spent, but they are so naturally and closely related that they converge into one purpose, and were not independent propositions.

8. ———: To Build Court House: Also to Acquire Site: Statute. The words of the enabling statute (Laws 1913, p. 125) authorizing a county to incur an indebtedness for the purpose of "building a court house" are synonymous with the words of the Constitution (Art. X, sec. 12) authorizing a county to increase its indebtedness "for the erection of a court house," and both the word "building" and the word "erection" imply that the money so voted can be used to construct a court house and to acquire a site for it, or to acquire additional ground for a site. The rule for the interpretation of statutes is that a power given carries with it, incidentally or by implication, powers not expressed but necessary to render effective the one expressed; and a court house cannot be erected without a site.

9. ———: Printed Instructions. The fact that no instructions were printed by the county clerk and posted at the polling places was a mere irregularity, and did not invalidate the election.

10. ——: Guard Rails and Booths: Failure to Provide: Statutory Implications. The Legislature has not declared a failure to furnish places for secluded voters shall invalidate an election, which is a most material circumstance for consideration in determining the consequences of the failure of an official to do something the statute ordered him to do; but the circumstance, though material, is not conclusive, since the intention of the Legislature that a particular provision shall be absolute and vital may be as plainly derived from the implications and policy of the pertinent statute as from express words.

11. ——: ——: ——: Honest Election. An election conducted honestly and according to the Australian Ballot Law should not be annulled merely because the election officers failed to provide booths and guard-rails for polling in secrecy, the ballot being short, containing but a single proposition and being easy of concealment. The essential object of the statutory direction for booths was a free and honest election; and where there is nothing before the court to prove that the lack of booths prevented a free and honest election, though it must have made secrecy less convenient, the court will not annul the election.

12. ——: Punishing Electors: Omissions of Officials. It is not sufficient to say that electors ought not to be punished by annulling their will as expressed at the polls for the transgression of election officials over whose conduct they have no control. The right rule is that the helplessness of the voters regarding the conduct of an election is a circumstance tending to the conclusion that the Legislature did not intend to visit upon them so harsh a consequence of official delinquency without proof that thereby the expression of their will was perverted by fraud, intimidation, coercive spying, or the fear of factional groups or leaders.

*Mandamus.*

WRIT ISSUED.

*Shepard & Oliver* and *Ward & Reeves* for relators.

(1) Respondents' contention is that the election is illegal and void because not held in conformity with the Australian Ballot Law. Where a failure to provide for absolute secrecy, according to that law, could not reasonably have had any obstructive or unfair influence on said election since the ballots were short and small, and where no charge of fraud or illegal votes or differences in the

election thereby, such failure to follow the Australian Ballot Law does not make the election illegal or void. Brueninger v. Hill, 210 S. W. 70; State ex rel. v. Hackman, 273 Mo. 695; State ex rel. v. Hackman, 274 Mo. 563; Bine v. Jackson County, 266 Mo. 240; Laws 1913, p. 125. (2) The contention that there were four propositions voted on in one election is without foundation. There was but one proposition, viz., to create an indebtedness of $150,000, to erect and equip a courthouse and buy additional site, if necessary, therefor. Where there are two or more things to be considered, and all relate to, and together collectively connect and combine in the accomplishment of one purpose, then they may all be submitted at an election at one time, for they in fact constitute, and are, but one proposition. State ex rel. v. Allen, 183 Mo. 283; State ex rel. v. Allen, 178 Mo. 555; State ex rel. v. Wilder, 200 Mo. 97; State ex rel. v. Gordon, 231 Mo. 566; State ex rel. v. Gordon, 223 Mo. 1. (3) The last contention is that this suit can not be maintained because certain citizens of Pemiscot County have now pending an injunction suit in the Circuit Court to prevent the county court from selling the bonds and levying the taxes in question. (a) As a matter of law an injunction suit pending in the Circuit Court does not prevent the Supreme Court from issuing mandamus against the officer sought to be enjoined. State ex rel. v. Hackman, 202 S. W. 7. (b) But before this action was brought these respondents, as the County Court of Pemiscot County, had made the identical order that was sought by the injunction suit. In other words, they refused to issue the bond and levy the tax and thereby did the exact thing the injunction suit sought to force them to do.

*McKay & Medling* and *Fauntleroy, Cullen & Hay* for respondents.

(1) An election which is not held in conformity to the Australian Ballot Law, R. S. 1909, Article 5, is illegal and void, and equity will grant relief against such an

election and restrain proceedings thereunder. Gaston v. Lamkin, 115 Mo. 20. (2) The proceedings on which the alleged election is based show on their face that said election is illegal and void, because the electors were required to vote on more than one proposition, to-wit: (a) A proposition to build a new courthouse; (b) a proposition to enlarge the old courthouse; (c) a proposition to buy land for a site for the courthouse; (d) a proposition to furnish and equip said courthouse. Two or more separate and distinct propositions cannot be combined and submitted jointly as one question. State ex rel. v. Allen, 186 Mo. 673; State ex rel. v. Wilder, 200 Mo. 103; State ex rel. v. Wilder, 217 Mo. 261; State ex rel. v. Gordon, 268 Mo. 327. (3) In the former proceeding to enjoin respondents from proceeding under the alleged election, the Circuit Court of Pemiscot County, as a court of equity, has power to pass on the validity of said election for the grounds stated in the petition in that case, and particularly to entertain the ground of fraud therein alleged. A chancery court had jurisdiction of a contest of an election brought to determine whether a county should subscribe for the stock of a railroad. Catlett v. Knoxville Railroad Co., 120 Tenn. 699, 112 S. W. 559. Where the constitution provided for an election to determine the policy of creating a bonded indebtedness and prohibited the issuance of bonds without the consent of two-thirds of the voters of the county, but provided no machinery for enforcing the provision, it was held that the constitution by necessary implication conferred on the court of chancery jurisdiction to protect and enforce the will of the people by suitable and proper procedure. Gibson v. Trinity County, 80 Cal. 359, 22 Pac. 225. So it has been held that a court of equity will take jurisdiction of a local option election contest where there is no statutory method for settling the contest. Marsden v. Harlocker, 48 Ore. 90, 85 Pac. 328, 120 Am. St. 786, distinguishing McWhirter v. Brainard, 5 Ore. 426. (4) Where an election relates to the location or change of a

county seat, it has been held in some jurisdictions, in the absence of any statute expressly authorizing such proceedings, that equity will intervene to determine a contested election because of irregularities or fraud in the conduct thereof, on the ground that the constitution, by implication, confers such jurisdiction. Boran v. Smith, 47 Ill. 482; People v. Wiant, 48 Ill. 263; Dickey v. Reed, 78 Ill. 262; Devous v. Gallatin County, 244 Ill. 40, 18 Ann. Cas. 422; Sweatt v. Faville, 23 Iowa, 321; State v. Eggleston, 34 Kan. 714, 10 Pac. 3. See, also, Shaw v. Circuit Ct., 129 N. W. (S. D.) 907.

GOODE, J.—This is a proceeding to compel the respondents, who are the judges of the County Court of Pemiscot County, to carry into effect the result of an election held September 9, 1919, at the usual voting precincts throughout the county, to ascertain the will of the qualified voters concerning a proposition to incur a county debt of $150,000, "for the purpose of building, equipping and furnishing a court house in the City of Caruthersville . . . and purchasing such additional ground, if any, as may be deemed to be for the best interest of said county; and to provide a proper and suitable site for said court house, . . . and to issue bonds of Pemiscot County, Missouri, therefor, in the total sum of one hundred and fifty thousand dollars, bearing interest at the rate of five per cent per annum," payable in enumerated installments. The proceedings which led up to the order for the election are conceded to have been regular except in the particulars hereinafter mentioned; and the result of the vote, on the face of the returns made by the officers of the voting precincts, was that more than two-thirds of the qualified voters, who voted, favored the proposition. But the county court refused to issue the bonds or to levy an annual tax to pay the interest and create a sinking fund to pay the principal in twenty years. After finding the proposition had carried by the requisite majority, the county court, on November 5, 1919, entered of record the reason why

it refused to carry out the will of the voters, saying that upon reconsidering the petition filed by more than one hundred qualified voters of the county, requesting the election, and reconsidering the notice for the election as published, the court found "the same are and were insufficient and for that reason such election is invalid, and, therefore, the court refuses to direct the issuance of the bonds," etc. In the order for the election said court had held the petition complied with the law.

The return to the alternative writ, after a part of it wherein the defense was set up that the proposition was carried by fraudulent and illegal votes, had been struck out, pleads invalidity of the election for three reasons: first, that it was not conducted in accordance with the requirements of the statutes of the State, known as the Australian Ballot Law, and the particulars in which those regulations are asserted to have been ignored are stated; second, these four propositions were submitted to the voters: to build a new court house; to enlarge the old one; to buy land for a site for a court house; to furnish and equip the courthouse; third, the pendency in the circuit court of the county of a suit filed in October, 1919, to enjoin the respondents as judges of the county court and the clerk of said court, from issuing bonds or levying a tax under the authority of the election. That suit was filed by B. F. Allen, and eight other plaintiffs, alleged to be taxpayers of the county. The petition is copied into the return of the respondents to the alternative writ issued in the present case. It attacks the validity of the election and asks that the county court and the clerk be enjoined from giving effect to it for precisely the facts averred in the return herein, plus the charge that illegal and fraudulent votes entered into the result. The petition for an injunction enumerates the number of the illegal votes charged to have been cast and counted in favor of the debt, and says a lawful majority of two-thirds of the voters did not vote for it. The return says a temporary restraining order or injunction may be is-

sued against the respondents at any time by the Circuit Court of Pemiscot County, and may be made permanent; that the suit is still pending and the issues raised in it touching the validity of the election are the same as those raised in the present proceeding; and, therefore, this cause should not be determined until the other one is decided. The reply to the return denies the averments of particular matters in which the Australian Ballot Law was ignored; denies the election is void for the reason that more than one proposition was submitted to the voters; denies illegal and fraudulent votes were cast and counted in favor of the proposition; and in connection with this denial pleads an estoppel against the defendants as judges of the county court for that said court found and adjudged of record the proposition submitted at the election ''did well and truly carry by a two-thirds majority of the qualified voters of said county voting at said election.'' The defense of the suit pending in the Pemiscot Circuit Court is alleged in the reply, or rather argued, to be no defense to this action, since the defendants had refused, and put their refusal on record, to issue the bonds and comply otherwise with the result of the election after the suit for an injunction was filed, but before the respondents had been served with process therein.

This agreement about the facts was made:

''It is hereby agreed that this cause may be submitted upon the following statement of facts as evidence in this case:

''(1) That the officers upon whom is imposed by law the duty of designating polling places did not at or before the holding of the election mentioned in the pleadings provide at the several polling places any booths or compartments, and that at said election no compartments were provided; nor was any guard or rail constructed so as to prevent persons approaching within five feet of the ballot boxes or the booths or compartments designed as a place wherein the voter could prepare his ballot.

"And it is further agreed that the Clerk of the County Court of said Pemiscot County did not cause to be printed in large type on cards, or otherwise, instructions for the guidance of electors preparing their ballots and no cards of any kind were furnished the judges of the election in each election district, nor were any notices posted in any place provided for the preparation of ballots nor in or about the polling places.

"It is further admitted that the injunction suit mentioned in the return to the alternative writ was instituted as alleged and is still pending in the circuit court.

"The above and foregoing supplemental abstract supplementing the prior abstract, contains the full and complete record of the proceedings, and shows the status of the case at the present time, before this court."

I. The first defense to be noticed is that when this proceeding was begun, a suit brought by several taxpayers of the county was pending in the Pemiscot Circuit Court against these respondents as judges of the county court and the clerk, to contest the election for the bonds on the identical grounds set up in respondents' return, except that in the return specific allegations of fraud in the various precincts are not made, but instead the petition in the injunction suit, which contains such allegations, is set out. Relators say that suit does not stand in the way of this one, because it was filed after the respondents had refused, by an entry of record, to carry into effect the result of the election. But the refusal was not for the reason that the result was obtained by fraudulent voting. Moreover, the effect of the previous refusal of the county court on the suit in equity, would be for the determination of the circuit court, if it possesses jurisdiction of the case, which is the question to be decided here.

It used to be held, and some courts yet accept the rule, that as mandamus is a high prerogative writ, the pendency of another action cannot bar it. [3 Black.

*Pending Suit.*

Comm. 110; Calaveras Co. v. Brockway, 30 Cal. 325.] The better rule is that mandamus having now come to be treated as in the nature of an ordinary civil action, the pendency of a prior suit between the same litigant parties, and involving the same subject-matter constitutes a bar unless adequate relief cannot be obtained in the prior suit. [State v. Matley, 17 Neb. 564; People ex rel. v. Wiant, 48 Ill. 263.]

The parties plaintiff in the equity suit are not the persons who are the relators in this action; but they are from the same class; that is, are taxpayers of the county, and in the exercise of a judicial discretion, it would be well to withhold a peremptory writ in the present case until the suit in the circuit court has been determined, if that court has jurisdiction of the case; a question we will proceed to consider.

II. The defense of the pendency of a prior suit in equity was urged in a contest proceeding in this court and ignored in the opinion. It must have been disregarded because this court thought the lower court was without jurisdiction of the suit in equity, as the opposite opinion was held by a dissenting judge. [State ex rel. Memphis v. Hackman, 273 Mo. 670.] The argument is that because an election of this kind may entail on taxpayers an increased burden, equity will take jurisdiction where fraud is charged, if no statutory mode of contesting the result has been provided; and in a few states the courts of equity have entertained jurisdiction of bills to contest elections under those circumstances. In most of the cases the controversy was over the removal of a county seat, and the proposition to remove was alleged to have been carried by the fraudulent receiving and counting of illegal votes by the election officers. [Boren v. Smith, 47 Ill. 482; People ex rel. v. Wiant, 48 Ill. 263; Sweatt v. Faville, 23 Iowa, 321; Shaw v. Circuit Court, 129 N. W. 907; Marsden v. Harlocker, 48 Ore. 90; Gibson v. Board of Supervisors, 80 Cal. 359.] In one case a court of equity

*Jurisdiction.*

took cognizance where the question voted on was whether a county should subscribe for stock in a railroad company. [Catlett v. Railroad, 120 Tenn. 699.] The principle on which jurisdiction was taken in the cited cases was that when the constitution of a state (or, we presume, a statute) requires a given majority in favor of the proposition to remove a county seat, or to authorize a public debt, a citizen, and particularly a taxpayer, is entitled to be protected by a court of equity in his lawful right to have the proposal treated as defeated at the polls, unless it received an actual and honest majority. This argument is not convincing, if we remember that an election to amend the Constitution and thereby affect, perchance, every taxpayer, has not been made contestable, but, on the contrary, the certificate of the Secretary of State to the Governor that the amendment voted on received a majority of the votes cast by the qualified voters of the State, is conclusive, and the Governor must thereupon proclaim the amendment has been duly ratified and become binding as part of the Constitution. [R. S. 1909, Art. 7, sec. 5973.] In this State, neither in the instance of an election to decide whether a county seat shall be changed, or of one to authorize a county indebtedness to be contracted, has an exception been made to the general rule that no election can be contested unless the Legislature has provided a remedy. The circuit courts of the State have been given jurisdiction of contests of elections for county and municipal offices, the jurisdiction to be exercised according to a prescribed procedure. [R. S. 1909, Art. 6, ch. 43.] No method of contesting the removal of a county seat has been enacted; a fact adverted to in a proceeding to prohibit a county court from changing the result, as shown by the returns from the precincts, of an election held on the question of removal. The opinion stated that in many states provision was made for the contest of such elections, but none existed in Missouri; plainly implying that absent a statutory remedy, no right of contest existed. [State ex rel. Ellis v. Elkin, 130 Mo. 90.]

In Kehr v. Columbia, 136 Mo. App. 322, which was a proceeding to contest an election under the Local Option Law, it was held the proceeding would not lie, notwithstanding a statute provided that such an election and the result thereof might be contested in the same manner as an election for county officers. [R. S. 1899, sec. 3031; R. S. 1909, sec. 7242.] The reason for this ruling was that although the statute authorized the contest of local option elections, it did not provide who should be the contestants and the contestees; in other words, did not provide the mode in which the action should be conducted. The Illinois cases in which equity took jurisdiction were noticed; but the court said that in this State election contests were purely statutory, and if no statute existed to authorize them, there could be no contest (136 Mo. App. 322, 328).

Our courts of review never have been called on to decide whether equity will take cognizance of a suit to determine the validity of an election held to authorize a public debt; but what expressions they have made on the general subject, all imply the necessity of a statutory remedy. [State ex rel. v. Dillon, 87 Mo. 487; State ex rel. v. Hough, 193 Mo. 615; Bradbury v. Wightman, 232 Mo. 392; Nance v. Kearbey, 251 Mo. 374; State v. Gamma, 149 Mo. App. 694.]

Contrary to the rule in Illinois and states which have followed its doctrine, it has been frequently held, where attempts were made to contest elections involving the removal of county seats, or other matters in which the freeholders of the county were interested, that no proceeding at law or in equity could be maintained unless the Legislature had authorized it; and this, too, in instances where the result of the election was charged to have been brought about by fraud. The reasons given for the doctrine vary. Sometimes the opinions say a private citizen has no interest in the location of a county seat which entitles him to contest; sometimes that the question is a political one and therefore outside the cognizance of equity, and in most of the opinions the

doctrine is declared that equity has no jurisdiction of an election contest.

In a Maryland suit to enjoin the commissioners of a county from issuing bonds to erect a court house at a place pursuant to an election to locate the county seat there, fraud in the election was alleged, the suit being by taxpayers. The court held that equity had no jurisdiction of an election contest of any kind. [Hamilton v. Carroll, 82 Md. 326.]

In Atty-General v. Supervisors, 38 Mich. 289, an injunction was asked at the suit of the Attorney-General to restrain the removal of a county seat on the allegation that the majority in favor of it was procured by illegal votes. The court held that a statute authorized the supervisers of election to determine and declare the result of the vote and their declaration was conclusive, as no intimation was given in the statute of any right to contest.

In State ex rel. Woodruff v. Police Jury, 41 La. Ann. 846, the proceeding was to contest an election for the removal of a county seat, and the decision was that in the absence of special statutory authority courts were without jurisdiction to determine such cases.

In Parmeter v. Bourne, 8 Wash. 45, it was held in a thoroughly considered opinion, that equity had no jurisdiction of the subject-matter of a suit to enjoin the removal of the county seat for fraud in the election by which the new location was chosen.

The doctrine that no contest lies where none has been provided for by legislation, was applied in a mandamus proceeding to contest an election for the purpose of locating a county seat. The decision was that the declaration of the result by the board of supervisers was conclusive and could not be controverted in the suit, although no other remedy was provided. The court said its decision was reluctantly given, because there was evidence tending strongly to show fraud; but that it was better for the fraud to go unpunished than for the land-

marks of the law to be altered. [Leigh v. State, 69 Ala. 261.]

It was held in a Georgia case, that an election of freeholders on the question of fencing against stock in the county, could not be inquired into by bill in equity, or *quo warranto* in the absence of legislative authority. [Skrine v. Jackson, 73 Ga. 377.]

It is argued that where there is no other remedy equity should take jurisdiction in order to prevent elections from being carried by illegal or fraudulent voting; that the case falls within the ancient jurisdiction of equity to grant relief in all cases of fraud. This argument carries weight, for alike in equity and in law fraud vitiates all affairs wherein it is predominantly influential. It is the province of equity to afford redress against such an influence when the common law provides no adequate remedy. An exception is made to this general doctrine in political affairs which have always been held to lie outside the sphere of equity, and doubtless for this reason it is held that a charge of fraud in the conduct of elections, is insufficient to enable a chancery court to entertain a contest. But property rights and interests are affected by the creation of public debts; which is a fact urged and sometimes accepted as a reason why a contest proceeding will lie in equity, if the statute provides no remedy and the election was one to incur a public indebtedness.

The provisions of the enacted law in this State regulating the contest of elections, is persuasive that the Legislature never has intended there should be a judicial inquiry concerning the legality of the voting in a county bond election. The Constitution itself commands the Legislature to designate the courts or judges by whom the several classes of election contests shall be tried and also to provide the manner of trial and all matters incident thereto. [Mo. Const., Art. VIII, sec. 9.] Pursuant to that mandate, statutes have been enacted to contest the election of various classes of officials, also

those held under the Local Option Law, and perhaps others. One section of the law reads as follows:

"Every court authorized to determine contested elections shall hear and determine the same in a summary manner, without any formal pleading; and the contest shall be determined at the first term of such court that shall be held fifteen days after the official counting of the votes, and service of notice of contest, unless the same shall be continued by consent, or for good cause shown." [R. S. 1909, sec. 5928.]

The expression "every court authorized to determine contested elections," etc., implies that specific authority must be granted to a court to try such cases, or it will not have the power to do so; that a general subject-matter or head of equity cognizance, like fraud, does not suffice to confer this power. Moreover, the mode of procedure ordered to be pursued in a contest proceeding, is incompatible with the course of a suit in equity.

The right of citizens and taxpayers to honest elections is meant to be protected by the judges who supervise the voting at the polls; and so far this protection has been deemed by the Legislature sufficient in case of elections like the one in controversy. The statutes impose on the judges the duty of passing on the qualifications of voters, and of deciding whether a person who offers to vote is entitled to do so. In the performance of this duty, the judges act in a judicial or a quasi-judicial capacity. [Pike v. Megoun, 44 Mo. 491; McGowan v. Gardner, 186 Mo. App. 484, 492; Blake v. Brothers, 79 Conn. 676, 11 L. R. A. (N. S.) 501, and citations in note.] The right is also accorded to any bystander to challenge a vote. [R. S. 1909, sec. 5900.] Elections to incur public debts have been conducted in this State from an early day, and yet the rule has always been declared that there can be no contest of any election except where one is authorized by a statute, and so far no statute of the kind has been enacted in respect of municipal bond elections; whereas statutes are in force for the contest of other

kinds. By reason of this non-action by the General Assembly and the common-law doctrine that the result of elections if declared by supervising officials, could not be re-examined judicially, and the prevalent doctrine that equity takes no cognizance of such matters, we hold the Circuit Court of Pemiscot County is without jurisdiction of the cause there pending to annul the election in contest.

III. Respondents contend four distinct propositions were submitted to the voters in such form that they had to vote for or against all of them, and could exercise no choice among them; therefore the election was invalid. [State ex rel. v. Gordon, 268 Mo. 321, 327.] The statement of respondents that the proposition voted on included the alternative of enlarging and repairing the old court house is erroneous. Nothing of the kind was mentioned in the notice to the voters, or in the proposition submitted to them.

*Diiferent Propositions.*

But it is said the proposal involved the incurring of a debt for three distinct purposes: to build a court house, to equip and furnish it, and to purchase more ground, if more was needed, for a suitable site for it. True the proceeds of the loan could be spent in those three ways; but the three are so naturally and closely related that they converge into one purpose, namely, providing a new court house for the county adequate to its needs, and in a condition to be used. Not only were the three things for which the money arising from the indebtedness could be paid naturally related to each other, but each thing was indispensable to accomplish the main object for which the loan was to be raised. A new court house without furniture in it would be useless; and if the site of the old one is too small to be a fit site for the new one, the latter cannot or ought not to be built without enlarging the site. We hold three independent propositions were not submitted in one, thereby compelling the voters of the county to either accept or reject all of them; but that

there were, so to speak, merely three essential items of one proposition. [State ex rel. Canton v. Allen, 178 Mo. 555; Thompson-Houston Co. v. Newton, 42 Fed. 723; Clark v. Manhattan Beach, 175 Cal. 637.]

It is argued the enabling act under which the election was held conferred no authority on the court to vote a debt wherewith to purchase additional ground for the site. The act declares, in effect, that

Power to Acquire Site.

when it is necessary for any county to incur an indebtedness for the purpose of building a court house, etc., an election may be ordered on the petition of one hundred qualified voters and taxpayers of the county, to authorize the loan. [Laws 1913, p. 125.] Taken verbally, the act confers power to incur an indebtness only for *building* a court house, etc., the purpose being to enable the county to take advantage of the proviso of the Constitution of the State allowing counties to become indebted in any year beyond the income and revenue provided for the year, with the assent of two-thirds of the voters thereof, voting at an election to be held for that purpose. [Const., Art. X. sec. 12.] In the preceding section, which confers power on counties in order to provide public buildings, to increase, with the assent of two-thirds of the voters, the general rate of taxation prescribed in the section, the language is: "For the purpose of erecting public buildings in counties, cities or school districts, the rate of taxation herein limited may be increased," etc. [Const., Art. X. sec. 11.] And in Section 12, the words "for the erection of a court house or jail," are used in the proviso giving the right to exceed an indebtedness of five per cent of the taxable property of the county for certain purposes, and among them the erection of a court house, etc. It is obvious that the words "for the purpose of *building* a court house," etc., in the enabling act, are used as synonymous with the words "for the erection of a court house," etc., in the Constitution. The question then is whether these synonymous expressions suffice to empower the electors

of a county to authorize a debt for the purpose of an additional site when needed for the erection of a new court house or other public building, or limit the right of the voters to the incurring of a debt merely to erect or build the house. Just here it is to be noted that the enabling act contemplates the building of jails, poor houses, sanitariums and other buildings, as well as court houses; so if we grant the Legislature may have assumed a county would own a sufficient site for a court house, it is scarcely likely the same assumption would have been made regarding the various other buildings. On the contrary it is so likely that counties will be without appropriate sites, that the reasonable supposition is the Legislature enacted the enabling statute with that probability in mind. The rule for interpreting statutes, that a power given carries with it, incidentally or by implication, powers not expressed but necessary to render effective the one that is expressed, would require the construction that authority to incur a debt for the erection of a public building, impliedly embraces authority to buy a site for it; and this for the plain reason that without a site the building cannot be erected. [Endlich on Statutes, sec. 418.]

This question has been decided in principle by an eminent court in a case unlike this one in most of its facts, but like it in the facts relevant to the immediate point. [Atty. Gen. v. Parsons, 8 Ves. 186.] Edward Tawney had conveyed to the corporation of the City of Oxford, two free-hold parcels of land and their appurtenances, in trust for a charitable use. Afterwards he gave to said corporation, by his will, 4500 pounds in bank annuities, a portion of the interest thereon to be paid annually to designated poor persons, and the remainder to be used in rebuilding, adding to, or improving the premises he had conveyed to the city by deed. In a bill filed by the Attorney-General to establish the trust, the question was whether by the words ''add to'' in the will, the testator had not conferred on the trus-

tees of the trust, power, if they thought fit, to purchase land for the purpose of the charity, thereby bringing more land into mortmain, contrary to the law of England. In discussing this question the court considered the construction which had been put by decisions upon the word "erect" (in the case of power to erect buildings), and held that prima-facie a testator in using the word should be taken to mean land could be bought whereon to erect a charitable foundation, unless the will manifested an intention that the land should be otherwise procured. The opinion said: "I agree with the late cases; which go a great way to establish that the court cannot put such a construction upon the word 'erect' as was put upon that word in former cases; and that prima-facie the testator must be taken to mean by that word that land should be bought."

In Clarke v. Inhabitants of Town of Brookfield, this court ruled that power granted to a municipality "to prevent and extinguish fires" carried with it, by implication, the power to erect a fire engine house. [81 Mo. 503.]

We consider it but a reasonable interpretation of the enabling act to say that, in empowering the county to incur a debt to build a court house, the act impliedly granted power to expend part of the money realized from the loan in the purchase of additional ground for a site—ground to enlarge the old site and render it suitable for the proposed building.

IV. Another defense is that booths were not provided for voters at the polling places with guardrails, and no printed instructions were prepared by the clerk of the county court for the voters. That no printed instructions were posted was a mere irregularity. The vote to be cast was upon a single proposition, the form of the ballot was simple, and it is difficult to see how voters could have been at a loss for want of instructions about how to prepare their ballots. At all events the omission of this

Printed
Instructions.

direction of the statute does not invalidate the election. The law is the same in respect of the lack of guardrails. [Skelton v. Ulen, 217 Mo. 383, 387.]

Whether the omission of the county court to furnish places, booths or compartments for polling in secrecy, should be held to annul the election, is a question difficult to answer, and not to be answered without misgiving. This is so by reason of the leniency of the courts in dealing with the effect of official misconduct upon the validity of elections. A ballot prepared by the voter screened from the observation and influence of other persons, is the principal object of the statute now in force, regulating the method of conducting elections, and officials ought to provide, in every instance, the devices the statutes command them to furnish in order to accomplish that purpose. True there is more need, in the interest of secret and independent voting, for booths or other kinds of privacy, in general elections than when the people's will is to be expressed by a short ballot upon a single proposal; as for contracting a public debt. In the former case the elector has to make up his vote on a large ballot, or from a number of large ballots, with the names of various candidates and of different parties printed thereon. Selection among the candidates hardly can be made in a thoughtful way except in private, nor can the act of preparing the vote be concealed easily, as it can be when the ballot contains nothing but a brief formula for voting on one proposition; yet the law has declared an election like the one in controversy shall be conducted under the statutes regulating elections for officials, as far as those statutes are applicable. The possibility of easy concealment by the voter of his ballot while he is preparing it, was adverted to as one reason for the decision in Breuninger v. Hill, against the contention that the failure of the municipality to provide voting booths for the election there in controversy annulled the result. In that case the failure did not occur in every precinct, but only in a considerable

*Failure to Provide Booths.*

number in the City of St. Joseph; nor were the city officials without excuse for not supplying booths where there were none; for an effort was made to place them at all the polls, but inclement weather prevented this from being done. The tone of the opinion, though not the exact point decided, tends to the view that when the vote is on one question and the ballots to be used have printed on them, in a short form, the alternatives of the proposition, and the voter has only to scratch out the one he is opposed to, the want of booths at the polling places into which the voters might retire, will not, *per se*, and without proof that secret, independent and honest voting was impracticable, nullify the result. In several other states the question has been passed upon and in every instance the lack of booths held to be an irregularity. In most cases, but not in every one, the lack was only in a precinct or two; but this fact was not made the reason for deciding, as was done, that the failure to furnish booths was no cause to set aside the election, if insufficient evidence was adduced to show secrecy in balloting was prevented by the lack of booths; the breach of the duty being held an offense for which the culpable officials were punishable, but one not of the essence of a legal election. [277 Mo. 239.]

In Patton v. Watkins, 131 Ala. 387, there were no booths at one precinct; but the decision is of less weight on the general question, because the statutes of Alabama lean strongly against avoiding votes for official errors.

In Altgelt v. Callaghan, 144 S. W. (Tex. Civ. App.) 1166, the question was upon the adoption of a city charter. It was held ballots were not invalidated because prepared outside the booths.

In Younker v. Susong, 173 Iowa, 663, the controversy was over a special election for the establishment of a municipal court in Des Moines. It was charged and proved neither voting machines nor booths were used, though the law required them to be. The opinion said, at page 670: "Statutes prescribing the mode of pro-

284 Mo.—5

ceeding of public officers are regarded as directory unless there is something in the statute which shows a different intent. In the instant case the electors were not to blame for the failure of the officers to provide voting machines and booths, but the mistakes, if any, were those of the officials. Under such circumstances, prejudice must be shown in order to defeat an election fairly held. [Kinney v. Howard, 133 Iowa, 94.]''

Links v. Anderson, 168 Pac. (Ore.) 605, was a proceeding to contest an election to organize an irrigation district, and one complaint was that ''no proper voting places or booths were used to secure the secrecy of the ballot;'' upon which point the court said: ''No showing is made that anybody was intimidated or failed to cast a free ballot because of the lack of secrecy at the polls.''

In those cases the argument against the legality of the election was rejected on the ground that although the officials in charge had been remiss in respect of the particular duty imposed on them by statute, it was not shown the effect of their transgression was to deprive the electors of an opportunity to prepare their ballots according to law; that is, privately.

In the decisions in this State a pronounced aversion appears to invalidating an election for the non-observance by the officials in charge, of a duty exacted of them by the law unless, in consequence of the default, fraud entered into the voting sufficient to affect the result or leave it uncertain; or, if the omitted regulation was one intended to secure the making out of ballots in seclusion, that the conditions at the polls or the complications of the ballot were such that it should be taken for granted there was no adequate opportunity for private balloting.

In Bowers v. Smith, 111 Mo. 45, a famous and authoritative case, it was held, among other rulings, that assigning less than the prescribed number of judges to the precincts did not vitiate the result.

In Atkeson v. Lay, 115 Mo. 538, 557, the court held the failure of the county clerk to publish the ballot in

two newspapers in a county as required by statute, or in any paper therein, was an irregularity not touching the validity of the vote in the county.

In Hall v. Schoenecke, 128 Mo. 661, 668, the contention was overruled that ballots prepared outside the booths were illegal, there being no evidence to prove they were not prepared secretly.

In Hope v. Flentge, 140 Mo. 390, 1. c. pp. 403, et seq., two of the objections to the legality of the result of the voting were that the judges prepared ballots for the voters without requiring an affidavit of the voter that he was not able to prepare his vote, and that the judges entered the booths to assist the electors; both of which acts the law forbade. The opinion remarked upon the lack of allegation or evidence of fraud in these unlawful acts, and then said that the "failure of the officer to perform some prescribed duty, in the absence of any fraud or imposition practiced upon the voters, will not deprive him of his ballot *unless* the language of the statute allows no other alternative." In denouncing the intrusion of the judges upon the privacy of the booths, the court said this "was a positive violation of the law" which was punishable, but nevertheless held the ballots prepared while the judges were in the booths should be counted. The opinion declares it is a sound distinction which disfranchises a voter for his own failure to obey a positive rule of law adopted to secure an honest expression of the popular will, but refuses to disfranchise him for the neglect or misconduct of an officer over whose conduct he has no control, as to some provision which the Legislature has not deemed of sufficient importance to declare a non-compliance therewith shall avoid the election or render a ballot illegal and void.

In Sanders v. Lacks, 142 Mo. 255, the question of the effect of too few judges at the polling places was reviewed along with other complaints. The opinion is instructive and discussed the effect of official misconduct in holding elections, saying that the courts have pro-

mulgated a practical general rule, and then quotes from a text-work a statement of the rule:

" 'If the statute expressly declares any particular act to be essential to the validity of the election, or that its omission shall render the election void, all courts whose duty it is to enforce such statute must so hold, whether the particular act in question goes to the merits, or affects the result of the election, or not. Such a statute is imperative, and all considerations touching its policy or impolicy must be addressed to the Legislature. But if, as in most cases, that statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as mandatory, if they do, and directory, if they do not, affect the actual merits of the election.' [McCrary, Elections (4 Ed.), sec. 225.] "

In Skelton v. Ulen, 217 Mo. 383, 387, the absence of screens and guardrails around the booths and the entrance into them of divers persons while the voters were making out their ballots, was held not to avoid the ballots, there being no proof the irregularities were fraudulent or instigated by the contestee, or that his vote was increased. The declarations of law approved were to the effect that the primary object of the law "is to preserve the freedom and independence of the electors" in preparing and depositing their ballots "free from observation and outside influence; and if this object was not attained there was not a valid election." But no proof was made that secret voting was not maintained.

In State ex rel. Memphis v. Hackmann, 273 Mo. 670, manifold violations of the statutory rules for voting were proved, but held not grounds to set aside the result in default of proof of fraud or that the voting was not independent.

Many other decisions have been rendered by the appellate courts of this State which. are in agreement with the doctrine of those cited.

Much thought has been devoted by the English courts to the problem of what consequences should follow violations of ballot laws, and the conclusions reached are in accord with those of the courts of this State. In a leading case these rules were laid down: an election will be held void if the court is satisfied it was not conducted under subsisting election laws, or if the majority of the electors were shown to have been prevented from voting according to their own preference by corruption or intimidation, or by want of the necessary machinery for so voting, or by the fraudulent counting of votes; that it should be held void, too, if the court was unable to say whether or not in consequence of those defects, there was a free and fair election. Considering further the question of whether an election was really conducted under the election laws at all, the court said the point would depend on whether the departure from the prescribed method of voting was so great as to satisfy a court the election was not under the existing law; that it was not enough to say great mistakes were made in carrying out the law; but the court must be able to say that either wilfully or erroneously the election was not carried out under those laws, but under some other method. [Woodward v. Sarsons, L. R. 10 C. P. 733, 743, et seq.]

The respondents rely particularly on Gaston v. Lamkin, 115 Mo. 21, 35, but it only apparently lends support to their position; for the decision was given against the validity of the election there involved, because it was held in disregard of the controlling statutes, the Australian Ballot Law: ·

"The salient features of the system presented by the provisions contained in these sections are that at such an election no ballot shall be cast or counted except one printed at the public expense, provided by public officers, indorsed by two of them in a certain manner, delivered by them to the voter, and by him prepared alone in a certain manner in a private place provided for that purpose, screened from the observation of others, folded so as to conceal the face and expose the indorsement, and

forthwith voted before the voter leaves the polling place.

"It is conceded that the election in the present instance was held in total disregard of these provisions of the statute; consequently no legal vote was cast or counted at such election. We have here, not merely irregularities in an election held in substantial compliance with the requirement of the law, but an election in which those requirements are wholly ignored and set at nought." [l. c. 35, 36.]

The election we are concerned with was held under the Australian Ballot Law and in conformity to all its provisions except those mentioned in the stipulation— namely, lack of booths, rails and instructions to voters. Therefore the material facts of the two cases are unlike. An election cannot be held at all except by authority of law; nor can officials call one on their own motion, and the holding of the one in issue in Gaston v. Lamkin, in disregard of the only law to authorize it, made it a nullity. The case of State ex rel. Miles and City of Macon v. Ellison, is unlike the present, though the opinion is favorable to the contention of respondents, for it says an election held without booths is not held under the Australian Ballot Law. The case was presented for decision on a demurrer to the grounds of contest alleged by the plaintiff, which included a total failure to comply with the provisions to secure a secret ballot by omitting to furnish booths, etc. But the charge was more comprehensive, embracing as it did an allegation that this was done fraudulently by the city and resulted in the voters being unable to cast a free and secret ballot, as persons crowded around the election places and electioneered for their side of the proposition under submission. [193 Mo. App. 306, 269 Mo. 151.] None of those facts occurred in the present case, except the omission to provide booths.

The Legislature has not declared failure to furnish places for secluded voting shall invalidate an election; a most material circumstance for consideration in determining the consequence of the failure of an official to do

something the statute ordered him to do. [Hall v. Schoenecke, 128 Mo. 668; Bowers v. Smith, 111 Mo. l. c. 61.] But the circumstance, though material, is not conclusive, since, it is possible for the intention of the Legislature that a particular provison shall be absolute and vital, to be as plainly derived from the implications and policy of the pertinent statutes, as from express words to that effect. [Hall v. Schoenecke, 128 Mo..l. c. 668.] The importance of the particular act ordered to be done, as bearing upon and tending to accomplish the main end of the law, is the criterion of whether the Legislature meant it to be imperative and a condition precedent to a valid result; an uncertain criterion at best, and fertile in producing diverse judgments.

It is often remarked in opinions that electors ought not to be punished by annulling their will as expressed at the polls for the transgressions of election officials, over whose conduct the electors have no control. That reflection is pertinent this far only: the helplessness of the voters regarding the management of an election is a circumstance tending to the conclusion that the Legislature did not intend to visit them with so harsh a consequence of official deliquency without proof that thereby the expression of their will was perverted by fraud or intimidation, coercive spying, or the fear of factional groups and leaders. If carried further the notion involves a fallacy; for the people are and must be responsible for the mistakes or offenses of the officers whom they entrust with power—must bear the consequences. The real inquiry in a case like this is: Did the Legislature intend a particular failure to observe the law should, in itself and without proof of its effect on the voting, annul an election; or was the purpose of the requirement simply to bring about a certain method of voting? The principle for deciding whether a statutory order was meant to be merely directory, is whether the act ordered was of the essence of the main object of the law, or rather a device to assist in realizing that object. [Howard v.

Bodington, L. R. 2 P. Div. 203; Neal v. Burrows, 34 Ark. 491; Hope v. Flentge, 140 Mo. 1. c. 40.]

In the present case the essential object was a free and honest election, and we have nothing before us to prove the lack of booths prevented one, though it must have made secret balloting less convenient; but we cannot presume the inconvenience was so great as to amount practically to a lack of opportunity to prepare ballots privately.

The adjudications upon the question in hand, the drift of judicial opinion about the effect of official defaults in holding elections and the want of evidence to prove the one in controversy was not conducted honestly and according to law, constrain us to hold it should not be annulled merely for the want of booths, as the ballot was short and easy to conceal from observation.

Wherefore it is ordered that a peremptory writ of mandamus issue to respondents, commanding them, without further delay and dispute, to make an order of record, directing the issuance of bonds of Pemiscot County in the sum of $150,000, and also make an order of record respecting an annual tax in sufficient sum to pay the interest thereon; and also to make an order of record respecting the levying of an annual tax in the nature of a sinking fund for the payment of a portion of the principal each year which will extinguish the debt of $150,000 in twenty years from the date of contracting the same. All concur, except *Woodson, J.,* absent.