STATE ex rel. BROWN et al.

v.

CAPE et al.

No. 7307.

Springfield Court of Appeals.

Missouri.

March 11, 1954.

L. Clark McNeill and Geo. F. Addison, Salem, for appellants.

G. C. Beckham, Steelville, Samuel Richeson, Potosi, for respondents.

STONE, Judge.

This is a proceeding in quo warranto to test the validity of the formation of "Enlarged School District R–2, Crawford County, Missouri", and more particularly the validity of the special school election held on October 21, 1952, under Section 165.680 RSMo 1949, V.A.M.S., at which the enlarged district was created by consolidation of Cuba Consolidated District No. 1 and some twenty-two common school districts in Crawford County. Upon respondents' motion at the close of relators' evidence, the trial court found for respondents, held that the election was valid, and authorized respondents, constituting the County Board of Education of Crawford County, to proceed with an election in the enlarged district for the purpose of electing directors therein. Section 165.687 RSMo 1949, V.A.M.S.

The challenged election was held at three voting places in the proposed enlarged district, but relators complain about the manner in which this election was conducted at only one of the three voting places, i. e., at the Cuba School House, where the heaviest balloting occurred and the vote was 734 for to 437 against. No complaint is made about the manner in which the election was conducted at the Taylor School House or at the Iron Ridge School House, where a majority of the votes were against reorganization. The proposition to form the enlarged district carried by an aggregate vote of 857 for to 774 against.

As stated in the language of their brief, relators' assault upon this election is "that in the election held in the Cuba voting place, there was such a flagrant violation, and such an utter disregard for the requirements, of the election laws that the election should be held to be invalid". The election at the Cuba School House was conducted in the gymnasium, which was about 90 feet in length, east and west, and about 45 feet in width, north and south. There were "bleachers" or seats along the north and

south sides of the gymnasuim and a stage at the west end. The entrance, through which voters came into this polling place, was on the south side of the gymnasuim and about 3 feet west of the southeast corner thereof. The three judges and two clerks of election sat around a table some 9 or 10 feet in length, which was located about 10 feet northwest of the entrance. A somewhat smaller table was placed against the east wall of the gymnasium, about 8 feet from the table at which the judges and clerks of election worked, and most of the voters marked their ballots on this smaller table.

Respondents admitted in their answer "that voting booths were not provided at the Cuba School House". However, it is clear that the absence of voting booths did not, in and of itself, invalidate this election, Lake v. Riutcel, Mo.Sup., 249 S.W.2d 450, 451(2); State ex rel. Wahl v. Speer, 284 Mo. 45, 64–72, 223 S.W. 655, 660–664; Breuninger v. Hill, 277 Mo. 239, 248, 210 S.W. 67, 69–70, particularly in view of the fact that the election was held for the purpose of determining the will of the voters upon a single proposal by a small ballot, approximately 3½ inches square. Lake v. Riutcel, supra, 249 S.W.2d loc. cit. 451(2); State ex rel. Wahl v. Speer, supra, 223 S.W. loc. cit. 660–661(7). "Such a ballot, encompassed, as it might have been, within the palm of the voter's hand while preparing it to be cast, did not require that paraphernalia as an auxiliary of secrecy which a reasonable construction of the statute might require in the preparation of a blanket ballot at a general election * * *." Breuninger v. Hill, 210 S.W. loc. cit. 70.

 Citing the foregoing as the leading cases in Missouri on the subject under consideration and conceding with commendable frankness, as stated in the language of their brief, "that failures to observe the provisions of the election law which do not violate the general spirit and controlling object of the law, will not invalidate an election in the absence of fraud in perpetration and result", nevertheless relators' counsel

insist that "the election in this case should be held to be invalid and a nullity because the absence of voting booths and the general conduct of the election so contributed, one to the other, that the balloting was not secret in fact". Of course, "elections should be so held as to afford a free and fair expression of the popular will and mandatory statutory requirements must be followed", State at inf. McKittrick ex rel. Martin v. Stoner, 347 Mo. 242, 146 S.W.2d 891, 894(8); but, " 'elections are not lightly set aside' and there is a vast difference in passing on the rules and regulations regarding the conduct of an election before the election is held and after." Armantrout v. Bohon, 349 Mo. 667, 162 S.W.2d 867, 871 (8–10). "As a general rule (in the absence of fraud), an election will not be annulled even if certain provisions of the law regarding elections have not been strictly followed." Bernhardt v. Long, 357 Mo. 427, 209 S.W.2d 112, 116(7); Armantrout v. Bohon, supra, 162 S.W.2d loc. cit. 871.

As has been pointed out by our Supreme Court, Breuninger v. Hill, supra, 210 S.W. loc. cit. 69, "a first essential, therefore, in the determination of the matter at issue, is whether any of the mandatory provisions of the Constitution or statutes regulating the rights of voters and the calling and conduct of the election, have been violated"; and, in the instant case as in the Armantrout case, supra, appellants do not contend that any mandatory law, either constitutional or statutory, was violated and the record discloses no such violation. Furthermore, although relators averred in their petition that the election at the Cuba school was conducted with "gross irregularities and fraud", no evidence of fraud was presented upon trial of the case and, upon appeal, relators' counsel have not contended, either in their brief or in their oral argument, that there was any fraud in the calling or in the conduct of the challenged election.

 With respect to the failure to provide voting booths, witness Whitson, a judge of election, who "was *against* the reorganization", explained that, when the

polls were opened, the matter was discussed with the deputy sheriff who was present; that Charles Wilmesherr, another of the judges of election, "asked the deputy what about the booths, is it much of a job to put these booths up", to which the deputy sheriff answered "Yes, it was quite a job"; that Wilmesherr then turned to witness Whitson and Charles Neron, the third judge of election, and "asked us if we thought it was necessary"; and, that "we agreed with him we didn't think it was absolutely necessary—consequently, no booths were erected". In view of relators' present complaints, it may be noted, as of more than passing significance, that Mr. Whitson and Mr. Neron, two of the three judges of election at the Cuba school, both of whom testified on behalf of relators upon trial, openly *opposed* reorganization, so the election was conducted under the immediate supervision and control of election officials who were friendly to, and in sympathy with, relators' cause. The record discloses no complaint on their part, at the time, about the manner in which this election was being conducted, although if, in fact, conditions at the Cuba polling place had been as unsatisfactory as relators now contend, we think it not unreasonable to believe that some effort to correct the situation would have been made by the judges of election.

When witness Whitson was asked what he had seen during the course of this election, which he thought to have been "improper", he named only two things, i. e., (1) the failure to provide booths (which he had agreed were not "absolutely necessary") and (2) that the deputy sheriff at the polls had helped "at least two" persons to vote their ballots. But, the persons "helped" by the deputy sheriff were not identified, and there was no showing as to the circumstances under which the deputy sheriff had "helped" such voters, whether he favored or opposed the proposition to reorganize, whether he said anything to the voters whom he "helped", or whether those voters cast ballots for or against the proposition submitted.

Relators further complain that "there were numerous people voting at the same time at the same small table with ballots in plain view and there was no place else to vote for (a) the judges instructed the voters to vote at the table and (b) there were no pencils except at the table and they were tied to the wall". The record shows that, in response to inquiries as to "the greatest number of people you saw around the table at any one time", witness Stubblefield (a checker) said "six or eight", witness Kespohl (a checker) said "four or five or six", witness Kemp said "probably six", and witness Brown said "in the neighborhood of eight or ten". Other witnesses testified that, at times, there were as many as twenty to twenty-five persons in the polling place, some waiting for ballots, some voting, and some turning in ballots to the receiving judge, which was neither unusual nor significant. In this connection, compare the factual situation reflected in Armantrout v. Bohon, supra, 162 S.W.2d loc. cit. 870, in which it was held that the notice of election contest did not state facts constituting a cause of action.

Practically all of the testimony adduced upon the question as to whether there was, in fact, secrecy of the ballot at this election was to the effect that certain witnesses "*could* have seen" or "*could* have told" how others were voting. For example, witness Whitson, who sat at the judges' table, thought that, "if * * * there were no one between me and the voter I *could* have told, I imagine in a good many instances, *from the position his pencil was* how he marked the ballot even if I couldn't have actually seen it". Witness Norton "thought" that he had been unable to keep his vote secret "because one (proposition) was at the top and one was at the bottom" of the small ballot. Witnesses Happel and Branson said that others "*could* have seen" how they voted "if they wanted to", and witness Kemp *could* have seen others voting "if I had been of a mind to look". But, only one witness, Paul Mullin, testified that he actually saw how any other person voted at this election, and Mullin's testimony was limited to the ballot of one voter, George H. Brown, also a witness for relators. On the other hand, witnesses Krulik, Stubble-

field and Kespohl who, as "checkers", were in the polling place for considerable periods of time, stated definitely that they did not know and could not have learned by observation how any person voted.

Relators did not show that any voter was required to mark his ballot on the smaller table, although most of them used the table for that purpose. Witness Norton admitted that no one told him that he had to mark his ballot on the table, but he "just took it for granted" because "they said that was the table". Witness Counts said that "they pointed to the table and that is what I used to vote on". Witness Clibourn complained about there being no booths before she asked "Where will I vote?" to which "they said 'on the table'". Other witnesses testified cumulatively along the same line. Witness Neron, a judge of election, said that "when people asked me I told them to vote on the table". He did not hear anyone inquire for booths.

The record clearly indicates that any voter, who wanted to do so, could have marked his ballot elsewhere in the large gymnasium under circumstances which would have assured complete secrecy of his ballot beyond room for question or argument. At least one witness testified that she saw some voters "go to the bleachers or down near the stage (at the west end) to mark their ballots". We are not impressed by relators' argument that "there was no place else to vote" other than the table, because "there were no pencils except at the table and they were tied to the wall", particularly in view of the fact that the only witness, who mentioned this in his testimony, admitted that he did not ask the judges or clerks for a pencil, and in view of the further fact that there was no showing that a pencil would not have been made available to any voter who might have needed or requested the use thereof.

Finally, and of primary importance in proper determination of the question as to whether this election was "so held as to afford a free and fair expression of the popular will", State at inf. McKittrick ex rel. Martin v. Stoner, supra, 146 S.W.2d loc. cit. 894(8), is the fact that there is nothing in the record to indicate that the conditions under which this election was conducted either changed or influenced the vote of any person, excepting only witness Brown, a partisan opponent of reorganization, who, although stating positively that "it didn't influence the way I voted", thought that he might have voted differently than he had intended, because "you can get confused". On the other hand, relators' witnesses repeatedly stated, on cross-examination, that they had voted as they had intended to vote, and that they had not been influenced by any of the conditions of which relators now complain.

Relators presented two witnesses who testified that they had entered the Cuba polling place with the intention of voting, but that, after they "saw the way the thing was set up", they left without asking for ballots. One of these witnesses, who admitted that he was opposed to reorganization, had worked in the election, and subsequently had signed the bond for costs in this case, conceded that, after leaving the Cuba school, he had cast his ballot at the Iron Ridge school, another of the designated polling places.

Relators' counsel suggest that "others too timid to cast their vote in the manner of their liking were too shy to come forth and testify to their timidity"; but neither the "confusion" incident to a bitterly-contested election nor the "timidity" of potential voters nor their failure or inability to present themselves for voting affords judicial license for invalidation of an election conducted without violation of any mandatory constitutional or statutory provision, without fraud, and in such manner as to afford an opportunity for "a free and fair expression of the popular will". Careful consideration of the record in this case impels the conclusion that such irregularities as may have existed or occurred in connection with conduct of the challenged election at the Cuba School House neither justify nor permit a finding that the election was in-

valid. Lake v. Riutcel, supra; State ex rel. Wahl v. Speer, supra; Nelson v. Watkinson, Mo.App., 262 S.W.2d 872.

The judgment of the trial court should be and is affirmed.

McDOWELL, P. J., and BLAIR, J., concur.