### BRIGGS v. GREENVILLE COUNTY *ET AL.*
### (135 S. E., 153)

1. Statutes.—Statute cannot be held void for uncertainty, if any reasonable and practical construction can be given to language, and mere doubt as to proper construction will not render it nugatory.

2. Statutes.—Provisions of Pay-As-You-Go Act as amended, as to making so-called reimbursement agreements between highway commission and county advancing funds, and to making reimbursements pursuant to agreements, *held* not void for uncertainty.

3. Highways.—Under Pay-As-You-Go Act, § 3, counties only are to be reimbursed by State Highway Commission for funds advanced for road construction, except in case of Ft. Mill township, in York County.

4. Highways.—Agreements under Pay-As-You-Go Act, providing for reimbursements to county for moneys advanced for construction of

State Highway within 10 years, *held* not in conflict with provisions as to time for making reimbursements.

5. HIGHWAYS.—Provision in Pay-As-You-Go Act that no county shall have two hard-surfaced cross-county roads until every other county in State has one, *held* not applicable to roads construed under reimbursement plan.

6. STATES.—Pay-As-You-Go Act, appropriating fund for reimbursement to counties advancing money for road construction covering period of years, *held* not in conflict with Const. Art. 10, § 2, forbidding continuing appropriations.

7. STATES.—In absence of constitutional prohibition, Legislature may make continuing appropriations.

8. STATES.—Pay-AsYou-Go Act, authorizing reimbursement to counties for moneys advanced for road construction, from special fund consisting of gasoline tax, automobile license tax, and federal aid, *held* not violative of Const. Art. 10, § 11, as incurring "debt" without vote of people.

9. COUNTIES.—County bond issue, under General Bond Act April 2, 1926 (34 Stat., 1001), and Greenville Bond Act March 23, 1926 (34 Stat., 1534), for moneys to be advanced to State Highway Commission under reimbursement agreement, *held* not bonded debt within Const., Art. 10, § 5, limiting amount thereof.

10. COUNTIES.—If principal of County bonds for money to be advanced to State Highway Commission is exempt from constitutional limitations on bonded debt because of reimbursement agreement with State Highway Commission interest on bonds is also exempt, even though property tax therefor may be necessary.

11. COUNTIES.—If proposed county bonds for money to be advanced to state highway commission under reimbursement agreement constituted bonded debt within Const. 10, § 5, amount of reimbursement should be offset in computing net bonded debt.

12. MUNICIPAL CORPORATIONS.—In computing bonded debt of municipality to determine if it is within constitutional or statutory limitation, there should be deducted from gross debt sinking funds or other funds pledged for payment thereof.

13. STATUTES.—Greenville Bond Act March 23, 1926 (34 Stat., 1534), authorizing county bonds to advance funds to State Highway Commission under reimbursement agreement, *held* not violative of Const., Art. 3, § 34, Subd. 9, prohibiting special law, where general law can be made applicable.

14. STATUTES.—Special act authorizing county or other political subdivision to issue bonds is not within prohibition of Const. Art. 3, § 34, Subd. 9, as to enactment of special laws, where general law can be made applicable.

15. Statutes.—General Bond Act of April 2, 1926 (34 Stat., 1001), authorizing issuance of bonds by county to advance funds to State Highway Commission under reimbursement agreement, *held* not in conflict with Const., Art. 3, § 34, Subd. 9, prohibiting enactment of special law, where general law can be made applicable.

16. Highways.—General Bond Act April 2, 1926 (34 Stat., 1001), creating incorporated road districts, *held* not to violate Const., Art. 10, § 5, declaring corporate authorities of counties, townships, school districts, cities, towns, and villages may be vested with power of taxation.

17. Statutes.—Pay-As-You-Go Act *held* not in conflict with Const. Art. 3, § 17, for failure to indicate in title that funds to be used on reimbursement agreements were to be raised by levy of gasoline and automobile license taxes.

18. Statutes.—It is not necessary that title be an index of contents of statute.

19. Automobiles — Constitutional Law — Licenses.—Pay-As-You-Go Act, authorizing levy of gasoline tax and automobile license tax, *held* not in conflict with Const. S. C., Art. 1, §§ 5, 6, Art. 10, § 1, or Const. U. S. Amend., 14.

Original application by Henry Briggs to restrain Greenville County and others from entering into so-called reimbursement agreements with the State Highway Commission, and from issuing bonds. Petition dismissed.

*Mr. Wm. H. Hoyt* and *C. F. Haynsworth,* for petitioner, cite: *Pay-As-You-Go Act:* 33 Stat. at Large, 1193. *Money to be drawn from treasury only by appropriations made by law:* Const. 1895, Art. X. Sec. 9. *Appropriations to be made for one year only:* Const. of 1895, Art. X, Sec. 2; 92 S. C., 81; 75 S. E., 392; 11 S. C., 458. *Creation of State debts without popular vote, except for annual current expenses, illegal:* Const. 1895, Art. X, Sec. 11. *Reimbursement agreements of highway commission create State debts:* 13 Barb. (N. Y.), 63; 7 N. Y., 9; 84 N. J. Eq., 150; 93 A., 732; 237 Pa. St., 501; 244 Ill., 596; 194 Ill., 457; S. W., 855. *Primary obligations of political subdivisions treated as bonded debts:* 132 S. C., 314; 128 S. E., 712. *Bonded indebtedness of political subdivisions limited:* Const. 1895, Art. X, Sec. 5. *Special*

*law prohibited where general law applicable:* Const. 1895, Art. III, Sec. 34; 85 S. C., 186; 67 S. E., 158; 73 S. C., 194; 52 S. E., 960. *Whether general law may be made applicable is judicial question:* 100 S. C., 478; 85 S. E., 50; 99 S. C., 377; 83 S. E., 594. *Corporate authorities of certain political subdivisions empowered to assess taxes:* Const. 1895, Art. X, Sec. 5. *Same; authorities of other divisions excluded:* 103 S. C., 184; 88 S. E., 128; 203 N. Y., 201; 96 N. E., 381. *Every Act of Legislature to cover one subject to be expressed in title:* Const. 1895, Art. III, Sec. 17. *Due process clause:* Const. 1895, Art. I, Sec. 5. *Taxation to be in proportion to value:* Const. 1895, Art. I, Sec. 6. *Graduated license on occupations and business provided:* Const. 1895, Art. X, Sec. 1.

*Messrs. Oscar K. Mauldin, J. L. Love,* and *Jas. M. Richardson,* for respondents, cite: *Act not to be held meaningless if it can be given reasonable interpretation:* Lewis' Sutherland on Stat. Construction, 2nd Ed., Sec. 86. *Pay-As-You-Go Act:* 33 Stat. at Large, 1193. *Legislature has plenary power over appropriations, subject to· constitutional limitations:* 36 Cyc., 891. *Legislature may make continuing appropriations unless prohibited by Constitution:* 18 Colo., 192; 32 P., 272; 17 Ariz., 433; 153 P., 773; 69 Minn., 187; 72 N. W., 65; 27 Cal., 175; 23 Idaho 372; 129 P., 1065; 36 Cyc., 893. *Appropriations to be made for one year only:* Const. 1895, Art. X, Sec. 2. *Reimbursement agreements of highway commission do not create debts prohibited by* Const. 1895, Art. X, Sec. 11: 134 Wash., 196; 235 P., 364; 87 Wash., 1; 151 P., 117; 19 Wash., 320; 53 P. 365; 12 Wash. 524; 41 P., 888; 104 Ohio St., 281; 135 N. E., 813; 152 Ga., 302; 109 S. E., 903; 19 Col., 63; 34 P., 274; 218 P., 913; 109 Minn., 6; 122 N. W., 469; 37 L. R. A. (N. S.), 1070; L. R. A., 1917-E, 134 N. C., 1; 46 S. E., 28; 60 Utah, 265; 208 P., 538. *Where principal of bonds exempt from constitu-*

*tional limit of indebtedness, interest thereon also exempt:*
130 S. E., 876; 193 Ala., 275; 103 Ky., 161; 6 S. Dak.,
525; 62 N. W., 104; 55. A. S. R., 857. *Bonds secured by
pledge of funds reasonably expected to be sufficient not sub-
ject to constitutional limit of indebtedness:* 130 S. E., 876;
132 S. C., 314; 128 S. E., 718; 123 S. C., 334; 116 S. E.,
277; 107 S. C., 230; 92 S. E., 477; 103 S. C., 10; 87 S. E.,
421. *Computation of bonded debt:* 90 Okla., 261; 217
P., 166; 204 Ala., 112; 86 So., 8. *Special law authorizing
political subdivision to issue bonds not prohibited by* Const.
1895 Art. III, Sec. 34, Subd., IX: 130 S. E., 876; 105 S.
C., 348; 89 S. E., 1028; 61 S. C., 205; 39 S. E., 381. *Con-
stitutionality of statutes creating road districts:* 131 S. C.,
109; 26 S. E., 644; 103 S. C., 184; 88 S. E., 128; 244 Mo.,
664; 149 S. W., 603; 29 C. J., 554. *Case distinguished:*
203 N. Y., 201; 96 N. E., 381. *Automobile license taxes,
gasoline taxes, etc., constitutional:* 131 S. C., 466; 128 S.
E., 8; 121 S. C., 5; 113 S. E., 345; 103 S. C., 10; 87 S. E.,
421; 66 S. C., 37; 44 S. E., 377; 262 U. S. 506.

October 18, 1926.

The opinion of the Court was delivered by MR. JUSTICE
COTHRAN.

This is an application by a taxpayer of Greenville County
to the Supreme Court in its original jurisdiction to restrain
the respondents from entering into so-called reimbursement
agreements with the State Highway Commission of South
Carolina, and from issuing bonds of Greenville County or of
the Road District of Greenville County, and to have the
statutes authorizing these agreements and bond issues de-
clared unconstitutional.

The respondents are Greenville County, the Road District
of Greenville County, and the Supervisor of Greenville
County. The Road District of Greenville County is co-
terminous with the County, and was created by the fifth
section of an Act approved April 2, 1926, referred to in

the Petition as the "General Bond Act" (34 Stat, at Large, p. 1001).

Upon the taxpayer's petition the writer issued a rule to show cause why the prayer of the petition should not be granted. The respondents have made a written return in which they admit the allegations of fact contained in the petition and deny certain conclusions of law set forth therein.

The respondents are about to enter into the so-called reimbursement agreements either in the name and behalf of said County, or in the name and behalf of said Road District. By the agreements, the County or District, as the case may be, will agree to advance to the State Highway Commission the moneys necessary for the construction of certain portions of the State Highway System in Greenville County, and the State Highway Commission will agree to construct the highways and reimburse the County or District, as the case may be, for all moneys so advanced, such reimbursement to be made out of the funds set apart and authorized to be used for the construction of a state highway system by the Act approved March 21, 1924, as amended, referred to in the petition as the "Pay-As-You-Go Act" (33 Stat. at Large, p. 1193) ; said funds being the automobile license tax, federal aid moneys, and three-fifths of the gasoline tax. The agreements will be made under the authority of the Pay-As-You-Go Act, as modified or amended, by implication, by the General Bond Act of April 2, 1926, and by an Act of March 23, 1926, referred to in the petition as the Greenville Bond Act.

By the terms of one or more of these proposed reimbursement agreements, the reimbursements to be made thereunder will be made within a period of ten years. The State Highway Commission has estimated and determined that all of the highways embraced in the state highway system and described in Section 1 of the Pay-As-You-Go Act can and will be constructed within 18 years from and after the year

1924 by means of the funds provided by said Act for said purpose. If all of the reimbursement agreements in question are made at the same time, they will provide for the construction of two or more hard-surfaced cross-county roads in Greenville County before every other county in the State has one such road.

For the purpose of raising the moneys required by these reimbursement agreements to be advanced to the State Highway Commission, the respondent Supervisor proposes to issue bonds of the County or of the Road District in an aggregate principal amount equal to the amount to be advanced to the State Highway Commission as aforesaid, which amount will be more than $1,500,000. These bonds will be issued either in pursuance of the Greenville Bond Act or in pursuance of the General Bond Act.

The question whether the State Highway Commission shall enter into these reimbursement agreements has not been submitted to the electors of the State of South Carolina at a general election, nor has any proposition to increase the debt of the State been approved by two-thirds of the qualified electors of the state voting on such question, as provided in Section 11 of Article 10 of the State Constitution.

The assessed value of taxable property in Greenville County is $29,530,130. The existing bonded debt of the County, subject to the limitations prescribed by Section 5 of Article 10 of the State Constitution, is 6.64 per cent. of such assessed value. If the sinking funds held for the payment of this debt are deducted, the net amount of the existing bonded debt will be 6.12 per cent. of such assessed valuation. The sinking funds consist of cash deposited in banks and evidenced by certificates of deposit. If the $1,-500,000 of bonds in question be issued in the name of Greenville County, and be treated as a part of its bonded debt within the meaning of Section 5 of Article 10 of the Constitution, the total amount of the County's bonded debt, less the amount of its sinking funds, will, after these bonds

are issued, amount to 11.20 per cent. of the assessed valua-
tion of taxable property of the County.   If the bonds are
issued as obligations of the Road District of Greenville
County, and are to be treated as bonded debt of the Road
District within the meaning of the Constitutional Limita-
tions, the bonded debt of the Road District will amount to
5.07 per cent. of the assessed valuation of taxable property
in the Road District.   The assessed value of taxable pro-
perty in Greenville City School District No. 17, in Greenville
County, is $9,595,620, and its bonded debt, less its sinking
funds, amounts to 8.27 per cent. of the assessed value of its
taxable property.

The petitioner raises a number of questions which will be
considered.   The very clear argument of counsel for the
respondents has practically been adopted as the opinion of
the Court.

1, 2     Are the provisions of the Pay-As-You-Go Act (33
Stat. at Large, p. 1193), as amended, relating to the
making of so-called reimbursement agreements, or
the provisions of said Act relating to the making of reim-
bursements pursuant to said agreements, void for un-
certainty?

In the petitioner's brief it is argued that the last proviso
of Section 3 of the Pay-As-You-Go Act is meaningless.   It
is also argued that it cannot be determined from the provi-
sions of this section whether or not counties only, or both
counties and townships, are to be reimbursed for hard-sur-
faced roads constructed before the passage of the Pay-As-
You-Go Act.

"A statute cannot be held void for uncertainty if any
reasonable and practical construction can be given to its
language.   Mere difficulty in ascertaining its meaning or
the fact that it is susceptible of different interpretations will
not render it nugatory.   Doubts as to its proper construc-
tion will not justify us in disregarding it." Lewis' Suther-
land on Statutory Construction (2d Ed.) § 86.

Section 3 of the Pay-As-You-Go Act relates exclusively to reimbursements to be made on account of hard-surfaced roads constructed prior to the passage of the Act. This section concludes with the following words:

"The State Highway Commission shall determine as nearly as possible how many years will be required to construct the above roads, and the said county or counties shall be reimbursed in equal annual installments during said estimated period of construction."

The petitioner questions the meaning of the words "the above roads" in this sentence. They mean the roads specifically described in the first section of the Pay-As-You-Go Act, just as do the words "the roads above described," which appear in the beginning of Section 2. This is a sensible meaning and the only sensible meaning that can be given to the words "the above roads" in the last sentence of Section 3. The sentence simply means that it shall be the duty of the State Highway Commission to determine as nearly as possible how many years will be required to construct the State Highway System specifically described in the first section of the Act, by means of the funds placed by the Act at the disposal of the Highway Commission, and that the counties which constructed hard-surfaced roads before the passage of the Act shall be reimbursed in equal annual installments extending over the number of years estimated to be required for the construction of the entire system. For example, if the Highway Commission shall have estimated that 18 years will be required to construct the entire system, each county will be reimbursed in 18 equal annual installments for the roads constructed before the passage of the Act.

The petitioner also maintains that the following words in Section 3 are meaningless:

"Provided, further, that no agreement for the reimbursement shall be made which shall necessitate the payment to said county or counties of a sum annually greater than said

county or counties would receive if said hard-surfaced roads had not been constructed."

The petitioner argues that the counties would receive nothing "if said hard-surfaced roads had not been constructed." There are two sensible constructions which can be given to this proviso, viz.: First, the proviso was intended to emphasize the fact that counties which constructed hard-surfaced roads before the passage of the Act are not to be reimbursed any sooner than they would be reimbursed if the roads were constructed under reimbursement agreements made after the passage of the Act. Second, the proviso contemplates that the State Highway Commission shall apportion or allot the State Highway Fund to each county in such equal annual installments as would build the roads within that county by the end of the estimated period for the completion of the entire system, and also contemplates that the amount of the reimbursements to be made to the County in any one year, plus the amount expended in each year in the County by the Highway Commission for road construction, shall not exceed the amount allotted to the County for such year as aforesaid:

The Attorney-General of South Carolina, in opinions rendered to the Chief Highway Commissioner on January 13 and February 16, 1926, adopts the second of these two possible constructions. We think that this is the correct construction.

In regard to the contention of the petitioner that Section 3 is ambiguous or contradictory on the question whether townships may be reimbursed for roads constructed before the passage of the Act, we think that it is clear from Section 3 that counties only are to be reimbursed, except in the case of Fort Mill Township, in York County, in which case the statute contemplates that the township shall be reimbursed out of the reimbursement moneys received by the County. Even if the intention of the Legislature on this point cannot be determined, and the

provisions relating to reimbursement for roads constructed before the passage of the Act should be held to be void for uncertainty, this would not affect the enforceability of the provisions relating to reimbursement for roads constructed after the passage of the Act.

Will the reimbursement agreements involved in this case be in conflict with the provisions of the Pay-As-You-Go Act relating to the time for making reimbursements under such agreements?

The requirement in the third section of the Pay-As-You-Go Act that a county shall be "reimbursed" in equal annual installments during the estimated period of construction of the entire State Highway System does not mean that the reimbursements to be made under each reimbursement agreement, considered by itself, must be made in this manner.   As we have suggested above, this requirement means that the total cost of constructing the State Highways in any given county shall be allotted to the county in equal annual installments during the estimated period of construction of the entire system, such allotment to be made either by way of reimbursement or by setting aside funds to the credit of the County for the construction of roads in the County by the State Highway Department. Any reimbursement agreement may provide for reimbursement within less than the estimated period of construction of the entire system, so long as all reimbursements or payments on account of the County's roads to be made in any one year will be within the County's allotment for such year. Moreover, the requirement in question would be satisfied if the aggregate amount of the reimbursements to be made to the County for roads constructed by the County either before or after the passage of the Act are made in equal annual installments during the estimated period of construction of the entire state system.   It does not appear from the allegations of the petition that reimbursement agreements

involved in this case would be in violation of the requirement, as we construe it.

Will the reimbursement agreements involved in this case be in conflict with the provisions of the Pay-As-You-Go Act, which declare that no county shall have constructed two hard-surfaced cross-county roads until every other county in the State has one hard-surfaced road across the county?

The provision in the second section of the Pay-As-You-Go Act that "No county in the State shall have constructed two hard-surfaced cross-county roads, until every other county in the State has one hard-surfaced road across the county," is not applicable to roads constructed under the reimbursement plan. The third section of the Act provides that the State Highway Commission may permit a county to construct "any" of the roads designated in Section 1 of the Act. The reimbursement plan would be practically unworkable if the Limitation in question were applicable to it.

Are the provisions of the Pay-As-You-Go Act which appropriate the funds out of which reimments are to be made under said reimbursement agreements in conflict with Section 2 of Article 10 of the Constitution of South Carolina, in that they appropriate money for more than one year?

The power of the Legislature over the matter of appropriations is plenary, except as restricted by the Constitution. 36 Cyc., 891. In the absence of a constitutional prohibition, the Legislature may make continuing appropriations; that is, those the payment of which is to be continued beyond the term or session of the Legislature by which they are made. 36 Cyc., 893, 894; *In re* Continuing Appropriations, 18 Colo., 192; 32 P., 272; *Callaghan v. Boyce,* 17 Ariz., 433; 153 P., 733; *Fleckten v. Lamberton,* 69 Minn., 187; 72 N. W., 65; *People v. Pacheco,* 27 Cal., 175; *Jeffreys v. Huston,* 23 Idaho, 372; 129 P., 1065.

*In Re* Continuing Appropriations, supra, the Court said (pages 193, 194 [32 P., 272]):

"The power of the Legislature, except as otherwise restricted by the Constitution, is plenary over the entire subject. The power can however, only be exercised subject to the provisions of Section 16 of Article 10 of the Constitution, by which appropriations in excess of the revenue are inhibited. * * * Under a similar provision with reference to appropriations to be found in the Federal Constitution, such continuing appropriations have been made by Congress, apparently without question, and it has been resorted to in this State, from the time of the inception of the State Government. When such appropriations are for the whole, or for a definite part of a certain special fund, we are of the opinion that they furnish sufficient authority for the disbursement of such fund. * * *

"The fact that in several of the states of this Union it has been found necessary to inhibit the making of continuing appropriations furnishes an agrument against the policy of such laws that will undoubtedly be given due weight by the Legislature, but with the policy or expediency, the courts have nothing to do, the power of the Legislature to make the appropriations being conceded."

The petitoner maintains that in this State continuing appropriations are forbidden by Section 2 of Article 10 of the Constitution, as construed in *State v. State Warehouse Commission,* 92 S. C., 81; 75 S. E., 392, where the Court held an appropriation for more than one year to be bad. That case is easily distinguished. There the General Assembly made an appropriation for expenditures of 1912 and 1913, and made no provision by taxation or otherwise for meeting the 1913 appropriation. In the present case, on the other hand the Legislature has appropriated a special fund, and thereby complied with the requirement in Section 2 of Article 10 of the Constitution that the General Assembly

shall "provide for an annual tax sufficient to defray the estimated expenses of the State for each year."

A constitutional provision in the same words as Section 2 of Article 10 of our constitution was considered by the Supreme Court in Minnesota in the case of *Fleckten v. Lamberton, supra,* where the principal question was the one we are now considering. The Court said (pages 190; 191 [72 N. W., 66]):

"While these provisions of the Constitution declare that the annual revenues shall be as great as the annual ordinary expenses, they do not imply that such revenues, though raised by taxation, may not be greater than such expenses, or great enough to defray in ten years the extraordinary expene of building a State Capitol.

"There is nothing in counsel's position that, because the life of a Legislature continues for only two years, therefore it can make nostandin g appropriations, or appropriations covering a longer period of time than such two years."

8      Will said reimbursement agreements constitute a debt of the State incurred without a vote of the people, in violation of Section 11 of Article 10 of the Constitution of South Carolina?

The proposed reimbursement agreements will not constitute a general liability of the State. The reimbursements to be made thereunder can be made only from a special fund consisting of the gasoline tax, automobile license tax, and federal aid. No property tax can ever be levied to meet these obligations.

Is such a limited liability a debt of the State in the constitutional sense? The underlying purpose of the constitutional provisions concerning the creation of state debt was that they should serve as a limit of taxation—as a protection to taxpayers, and especially those whose property might be subjected to taxation. This purpose will not be defeated if it should be held by this Court that a debt for the construction of a state highway system, payable exclusively

from federal aid moneys and special license taxes to be borne by the persons who will derive the principal benefits from the state highway system, is not a debt of the kind required by the Constitution to be approved by the voters of the State before it is incurred. According to the weight of authority in other states, such a debt does not fall within the terms of such a constitutional provision.

In *State v. Clausen,* 134 Wash., 196; 235 P., 364, An Act authorizing a bond issue for the erection of state capitol buildings, the principal and interest of the bonds to be payable only from revenues form the leasing and sale of lands granted to the State for such purposes by the federal government, was held not to create a "debt" without a vote of the people, in violation of the Constitution of the State of Washington.

In *Kasch v. Miller,* 104 Ohio, St., 281; 135 N. E., 813, bonds issued in the name of the State of Ohio, and payable exclusively out of the revenues derived from reservoirs, dams, etc., for which the bonds were issued, or out of the sale of the corpus in case of default, were held to be not a debt of the State within the meaning of the constitutional limitations.

In *Wright v. Hardwick,* 152 Ga., 302; 109 S. E., 903, it was held that obligations of the State of Georgia, payable exclusively out of the rentals of a state-owned railroad, did not constitute debts incurred in violation of constitutional provisions prohibiting the creation of State debt.

*In Re* Canal Certificates, 19 Colo., 63; 34 P., 274, where the facts were substantially the same as those in the case last mentioned, certificates of indebtedness issued by the State of Colorado were held to be exempt for the constitutional limitations upon the amount of State indebtedness.

In *Brown v. Ringdal,* 109 Minn., 6; 122 N. W., 469, certificates of indebtedness issued in the name of the State of Minnesota, and made payable exclusively from a special tax,

were held to be not state debts within the meaning of the constitutional limitations.

There are numerous cases to the same effect relating to bonds or other obligations issued in the name of municipal corporations. Many of them are collected in 37 L. R. A. (N. S.), 1070, and L. R. A., 1917-E, 437.

In *Shields v. City of Loveland,* 74 Colo., 27; 218 P., 913, where it was held that city bonds payable only from the revenue of an electric light plant, did not constitute debt within the meaning of the debt limitations, the Court said:

"The definitions of the word 'debt' are many, and depend on the context and the general subject with reference to which it is used. 17 C. J., 1371. Its meaning sections of the Constitution and statutes now before us must be determined by their purpose, which was to prevent the overburdening of the public and bankruptcy of the municipality. Clearly the revenue bonds are not within that purpose. The public can never be overburdened by that which it is under no obligation to discharge, nor can the city become bankrupt by what it does not have to pay."

In *Winston v. City of Spokane,* 12 Wash., 524; 41 P., 888, the syllabus is as follows:

"Const., Art. 8, § 6, providing that no city 'shall become indebted in any manner' over a certain amount, does not prohibit a city, indebted over said amount, from borrowing money to complete waterworks, where the loan was to be paid out of a special fund created by the receipts derived from such waterworks, without imposing any further liability on the general funds of the city."

See, also, *Faulkner v. Seattle,* 19 Wash., 320; 53 P., 365; *Brockenbrough v. Board of Water Com'rs of City of Charlotte,* 134 N. C., 1; 46 S. E., 28; *Wicks v. Salt Lake City,* 60 Utah, 265; 208 P., 538; *Uhler v. Olpmpia,* 87 Wash., 1; 151 P., 117, hearing denied in *Id.,* 87 Wash., 15; 152 P., 998.

All authorities agree that obligations incurred by a city for local improvements such as streets and sewers, which are payable exclusively from the proceeds of special assessments upon property benefited by the improvements, are not debts within the meaning of constitutional or statutory limitations. See Dillon on Municipal Corporations (5th Ed.), § 198. See, also, authorities cited in *Evans v. Beattie,* 210 N. W. — (MS. decision).

Will the issuance of the proposed bonds of Greenville County or of the coterminous road district of Greenville County be in violation of the provisions of Section 5 of Article 10 of the Constitution of South Carolina, limiting the amount of the bonded indebtedness of political subdivisions?

By the provisions of both the General Bond Act and the Greenville Bond Act, bonds issued thereunder will be "direct and general obligations" of a county or road district, "payable primarily" from an annual property tax. There must be applied, however, to the payment of the principal of the bonds and to the reduction of the annual tax for that purpose the moneys received from the State Highway Department by way of reimbursement under the reimbursement agreements, and there must be applied to the payment of the interest on the bonds and to the reduction of the annual tax for that purpose so much of the gasoline tax distributed to Greenville County under Section 11 of the Pay-As-You-Go Act as may be necessary for the purpose of paying such interest. No property tax can be levied if these other funds prove to be sufficient to pay the principal and interest of the bonds as they respectively fall due. It is estimated by the state highway department that the entire state highway system described in Section 1 of the Pay-As-You-Go Act can and will be constructed within 18 years from and after the year 1924, by means of the funds provided by the Act for that purpose, whether the work is done under reimbursement agreements or otherwise. This means,

of course, that the funds will be sufficient to make the proposed reimbursements to Greenville County or to the road district of Greenville County within the eighteen-year period.

Whether the county's share of the gasoline tax will be sufficient to provide for the payment of the interest on the proposed bond issue, without resorting to a property tax, does not appear from the record in this case. If the conclusion be reached that the principal of the bonds is exempt from the constitutional limitations on bonded debt, it must follow that the interest on the bonds is also exempt, even though a property tax may be necessary in order to pay the interest. See *Sullivan v. City Council of Charleston* (S. C.), 130 S. E., 876 (where the interest on the bonds there considered was payable solely from an annual property tax); *O'Rear v. Sartain,* 193 Ala., 275; 69 So., 554, Ann. Cas., 1918-B, 593; *City of Ashland v. Culbertson,* 103 Ky., 161; 44 S. W., 441; *In re State Warrants,* 6 S. D., 525; 62 N. W., 104; 55 Am. St. Rep., 857.

This Court has held a number of times that obligations of the same character as these bonds, secured by the pledge of a fund which might reasonably be expected to be sufficient to meet the obligations without resorting to the levy of a property tax, did not constitute bonded debt within the meaning of the constitutional limitations, notwithstanding that the full faith, credit, and taxing power of a political subdivision were pledged for the payment of the obligations. *Lillard v. Melton,* 103 S. C., 10; 87 S. E., 421. *Brownlee v. Brock,* 107 S. C., 230; 92 S. E., 477. *McIntyre v. Rogers,* 123 S. C., 334; 116 S. E., 277. *Barnwell v. Matthews,* 132 S. C., 314; 128 S. C., 712. *Sullivan* v. *City Council of Charleston* (S. C.), 130 S. E., 876.

In each of these cases the obligations passed upon undoubtedly constituted a debt in the technical and legal sense of that term, of apolitical subdivision—a debt payable in future years, evidenced by instruments designated as bonds or having all the characteristics of bonds. In all but one

of the cases the obligations were designated "certificates of indebtedness" rather than "bonds," but the decisions were not placed upon the ground that a certificate of indebtedness is not a bond. Indeed, in the recent case of *Sullivan v. City Council of Charleston* (S. C.), 130 S. E., 873 (decided on the same day as the case with the same title cited above), it was held that notes which were bonds in everything but name should be deemed to be bonds within the meaning of the constitutional limitations.

In one of the cases *(Lillard v. Melton)* the obligations were secured by the income of a canal company. In three of the cases *(Lillard v. Melton, Brownlee v. Brock, and McIntyre v. Rogers)* the obligations were secured by special assessments levied upon property benefited by street improvements, and payable in annual installments. In one case *(Sullivan v. City Council of Charleston)* the obligations were secured by past-due and unpaid taxes. In another case *(Barnwell v. Matthews)* they were secured, as in the present case, by a reimbursement agreement made pursuant to the "Pay-As-You-Go Act." In reliance upon the decisions in these five cases, millions of dollars of county and city obligations have been issued and are now outstanding.

The present case cannot be distinguished upon the ground that these bonds are "direct and general obligations" of a political subdivision, "payable primarily" from a property tax. This will be seen from the following review of the cases:

In *Lillard v. Melton, supra,* it was held that interset coupons of bonds issued by a corporation known as the "Board of Trustees of the Columbia Canal" did not constitute bonded debt of the City of Columbia within the meaning of Section 5 of Article 10 of the Constitution, notwithstanding that the city was primarily liable for the payment of the coupons. The statutes under which the bonds were issued (19 Stat., 1090, 1097, approved December 24, 1887) provided that payments of the coupons should be "guaran-

teed" by the city; that "said board of trustees shall, after the
year 1893, pay the interest on the said bonds each and every
year, if practicable for them to do so"; that the city "shall
be authorized and required to levy such a tax on the real
and personal property assessed for taxation in the City of
Columbia as may be necessary to pay the coupons,   *   *   *
for the year A. D. 1888, and shall annually thereafter levy a
tax sufficient to pay the coupons as they mature on said bonds,
and shall pay the same: *Provided,* that after the year 1893,
the Board of Trstees of the Columbia Canal shall pay over
semiannually to the City of Columbia" all of the net income
of the corporation, 'not exceeding in any one year the amount
of the coupons maturing"; that the city's "guaranty" should
be written on the bonds as follows: "The City of Columbia,
South Carolina, guarantees the prompt payment of each and
every coupon attached to this bond"; and that the coupons
should be payable at the City Treasurer's office. It is clear
from these provisions that the city's liability was primary
and direct.  The city was required to pay the coupons and to
levy a sufficient annual tax for that purpose, which tax was
doubtless to be reduced, however, by the amount of moneys
received from the canal corporation. The primary fund for
the payment of the coupons was the city tax.

In the same case "certificates of indebtedness" issued by,
and guaranteed by, the City of Columbia pursuant to 28
Stat., 585, were held to be not a part of the city's bonded
debt within the meaning of the constitutional limitations.
The statute authorizing the issuance of the certificates con-
tained the following recitals: That the city had assessed a
part of the cost of certain street improvements upon abut-
ting property owners; that the city desired "to issue certifi-
cates of indebtedness showing amounts due to said city by
said property owners as deferred payments upon such as-
sessments for the purpose of realizing money upon such cer-
tificates by either selling the same or borrowing money
thereon"; that "the property so assessed is bound to said

city for the payment of the deferred portions of such assessments, and such certificates of indebtedness do not constitute in reality debts against the city, but merely evidence debts due to the city, and the existence of said lien on said property will fully protect said city against loss upon guaranty of such certificates of indebtedness entered into by said city." These recitals were followed by a grant of authority to the city "to sell any such certificates of indebtedness which may hereafter be issued by said city * * * or to borrow money upon such certificates of indebtedness. and to pledge such certificates as collateral security for the payment of such debts, and, in either event, to guarantee the payment of such certificates according to the terms thereof, and to pledge the faith and credit of the city for the payment thereof." The record in the case shows that the certificates of indebtedness had fixed dates of maturity extending over a period of several years. Apparently, the certificates were intended to be assignments of the assessments. However that may be, it is clear that the city at least made an absolute guaranty of payment, under which it would become primarily liable at the maturity of the certificates for the payment of the amount thereof, and that the city's faith and credit were pledged for such payment.

The Court did not, in *Lillard v. Melton,* discuss at length the grounds for its decision that the obligation of the City of Columbia on the interest coupons and paving certificates above described should not be included as a part of the bonded debt of the City of Columbia within the meaning of the constitutional limitations. The Court merely said (page 425 [103 S. C., 19]) :

"Likewise, the liability of the city on the guarantee of the paving assessments and the interest on the canal bonds constitute but a contingent obligation and must be excluded."

In *Brownlee v. Brock, supra,* and in *McIntyre v. Rogers, supra,* paving certificates similar to those we have described were held, without discussion, to be exempt from the consti-

tutional limitations upon bonded debt upon the authority of *Lillard v. Melton.*

In *Barnwell v. Matthews, supra,* the facts were as follows: Act No. 348 of 1925 (34 Stat. at Large, 723, approved April 1, 1925) authorized Florence County to issue its "notes" in the amount of $225,000, maturing in three annual installments of $75,000 each, beginning four year after the date of the notes. Of the proceeds of the notes $205,-000 were to be used for the construction of two roads embraced in the State Highway System, and designated in Section 1 of the Pay-As-You-Go Act; and $20,000 of the proceeds were to be used for the construction of a road which had not yet become a part of the State Highway System. The Act directed the county to pledge as security for the payment of the notes "all surplus tolls arising from the operation of the Mars Bluff Bridge, and all tolls that may be derived from Godfrey's Ferry Bridge, which shall accrue to Florence County," and also "all reimbursements due from the State Highway Commission," except reimbursements to be paid during the years 1925, 1926, and 1927. The Act further provided as follows (Section 3):

"The full faith and credit and taxing powers of Florence County are hereby irrevocably pledged for the payment of said notes, and the Auditor of Florence County is hereby authorized and directed to make a sufficient levy to pay the interest and installments on said notes, but said levy shall be suspended in case the tolls and reimbursements above mentioned are sufficient to pay said interest and installments of said notes as they become due."

The Circuit Court held that the notes were not subject to the constitutional limitations on bonded debt. The judgment of the Circuit Court was affirmed, without opinion. The grounds for the decision are stated in the judgment of the Circuit Court as follows:

"In the instant case the Legislature has authorized the issuance of obligations to be secured primarily by bridge

tolls and highway reimbursements, the work performed with the funds derived from the notes being work specifically designated by statute as that of the State Highway Department, and for which the taxpayer is never to be liable, unless the resources pledged fail, and has declared in express language that such obligations are notes.  *  *  *  It is perhaps unfortunate that the Constitution is not more explicit in defining the term 'bonded debt,' but, be that as it may, I feel satisfied that, whatever other elements may be necessary to make up a bonded debt, certainly one of the most essential is that it must be a primary obligation of the political subdivision involved, and secured primarily by a tax levied on the property holders therein.  From the facts pleaded in the affirmative defense, and admitted by the demurrer, this essential element is wanting in these obligations.  They  *  *  *  secure funds borrowed for the building of roads of the 'State-wide system of public roads.' The Act providing for the building of such roads expressly declares, in Section 1 thereof, that they 'shall be constructed by the State of South Carolina and ever maintained as State highways.'  It is true Section 6 of the same Act permits a county to build any roads of such system and to be reimbursed thereof by the State, but this is in no way changes the fundamental purpose of the Act, which was to charge the State with the duty of constructing such roads and to impose upon it the corresponding obligation of paying for them.  The Act of April 1, 1925, makes explicit provision for two of the designated highways of the 'Pay-As-You-Go Act,' and authorizes the expenditure of $205,000 thereon. As to these it is too clear for argument that the county is only contingently liable, and, in fact, I am constrained to hold a taxpayer to the county can never be required to pay any part of such amount as the State would be legally bound to discharge such obligations without permitting such action against taxpayers to the county.

"Under the facts and the law, therefore, the proposed

notes to the extent of $205,000 are nothing more than guarantees or other contingent obligations of the county; and in no sense do they constitute a bonded debt thereof. The case, therefore, falls squarely within the decision in *Lillard v. Melton,* 103 S. C., 10; 87 S. E., 421, and must be controlled by it.

"While the additional $20,000 authorized to be issued is not to be used in the construction of a road already designated as a part of the State system, yet the demurrer admits that it is to become a part of such system. This being true, the notes representing it are governed by the same principles as apply to those to be issued for other two roads."

Whatever may be the true meaning of the third section of that Act, the same meaning should be given to the sections of the so-called Greenville Bond Act and the so-called General Bond Act, relating to the payment of bonds issued under those Acts. The latter Acts provide, as did the Florence County Act, for the levy of an annual property tax, and likewise declare that the levy shall be "suspended" in case the other funds pledged for the payment of the obligations shall prove to be sufficient.

In *Sullivan v. City Council of Charleston* (S. C.), 130 S. E., 876, the last of the five cases above referrel to, the facts were as follows: The city had on its books over $300,000 of uncollected taxes, levied in the years 1921, 1922, 1923, and 1924. On March 14, 1925, there was enacted a statute (Act No. 298 of 1925 [34 Stat. at Large, p. 661]), which provided as follows:

"The City Council of Charleston [the corporate name of the city], Charleston County, is hereby authorized and empowered from time to time to issue its certificates evidencing the amount of taxes or portions thereof which may have been levied against property in the City of Charleston, Charleston County, S. C., and which are past-due and unpaid, and to sell, hypothecate or pledge said certificates, and upon such sale, hypothecation or pledge to assign the same

and to guarantee in the name of the City Council of Charleston to the holder thereof the payment of the indebtedness evidenced thereby, at a place and time designated in such guarantee: *Provided, however,* That when the taxes evidenced by said certificates are collected, they shall be applied solely to the retirement of the same until all of said certificates are retired in full; and, *provided, further,* that in the event at any time sufficient of the said due and unpaid taxes have not been collected to meet the payment, to the holder of such certificates, of the amount which is to be paid under the guarantee endorsed on said certificates at the time such guarantee provides for payment, the City Council of Charleston shall forthwith levy and collect a tax upon all taxable property in the City of Charleston, which, added to the collections made on such due and unpaid taxes, will make a sum sufficient to meet the payment of the amount due on the certificates then maturing; such certificates shall have attached to them interest coupons certifying that the City Council of Charleston. will pay to the holder thereof the amount of interest therein stated, which interest shall be fixed by City Council in the ordinance authorizing the issuance of said certificates, and to meet the payment of said interest there shall be included in the general tax levy of each year in which such interest is due, as a part of the ordinary expenses of City Council, a sufficient tax to meet the payment thereof. The guarantee of City Council endorsed on said certificates shall provide the date on which the holder of said certificates may require payment thereof, and such time shall be fixed as in the opinion of City Council it is probable that the collection of said due and unpaid taxes will enable the same to be paid."

In a suit instituted by petition of a taxpayer, it was contended that the issuance of these certificates created a bonded debt within the meaning of the 8 per cent. constitutional limitation, and would be in violation of the Constitution; the existing bonded debt of the city being then up to the 8

ped cent. limit. In disposing of this contention, the Court merely said:

"The contention of the petitioner is untenable under * * * *Barnwell v. Matthews et al.,* 132 S. C., 314; 128 S. E., 712."

The gauaranty of the City of Charleston of the certificates of indebtedness was an absolute guaranty of payment, upon which the city would become primarily liable at the time of the maturity of the certificates. The holder of a certificate would not, in the event of nonpayment of the certificates at maturity, have to look to the past-due and unpaid taxes upon which the certificates were predicated. Moreover, it appears from the Act that the city could, "in the event, at any time, sufficient of the said due and unpaid taxes have not been collected to meet the payment * * * at the time such guarantee provides for payment, * * * forthwith levy and collect a tax" to pay the certificates, *i. e.,* the city could, if it foresaw an insufficiency in the collections of back taxes, levy the new tax prior to the time of maturity of the certificates. It is noteworthy also that the interest on the certificates was to be paid out of a new tax. Furthermore, we wish to call attention to the provision in the Act directing the city to make the certificates payable at such time as in the opinion of the city it was probable that the collection of the back taxes would enable the city to pay the certificates. Similar provisions are to be found in the Greenville Bond Act and in the General Bond Act.

From the foregoing review of the decisions, it is obvious that the present case cannot be distinguished from the previous cases upon the ground that the obligations here in question are payable primarily out of an *ad valorem* tax. If the statutes in question had not made such a provision for payment, but had required the holders of the proposed bonds to look first to the reimbursement moneys and gasoline tax, and required the county or road district to exhaust its remendies against the State Highway Commission or

the State Treasurer before it could resort to the levy of a property tax in order to meet the bonds, the bonds would be unsaleable, or they would have to be sold on such a high interest basis as to make the cost of the financing excessive.

If the proposed bonds would constitute a bonded debt within the meaning of Section 5 of Article 10 of the State Constitution, the amount of the reimbursements to be made by the State Highway Commission should be offset against, or deducted from, the amount of the bonds in computing the net bonded debt, subject to the constitutional limitations; and, since the amount of the bonds is not to exceed the amount of reimbursements to be agreed upon, the result will be that the net bonded debt of the county or road district will not be increased by the issuance of these bonds.

It is well settled that, in computing the bonded debt of a municipality for the purposes of a constitutional or statutory limitation upon bonded debt, there should be deducted from the gross bonded debt the sinking funds or other funds pledged for the payment of the debt, and only the difference between the two amounts should be considered as the bonded debt of the municipality. See *Reynolds v. Stark*, 90 Okla., 261; 217 P., 166, and *Town of Camden v. Fairbanks, Morse & Co.*, 204 Ala., 112; 86 So., 8, where most of the cases to this effect are cited.

In a majority of the cases the question was whether cash held in the sinking fund of a city, or some of the city's own bonds held in its sinking fund, should be offset against the gross bonded debt in computing the net debt subject to the debt limit, and it was held that these assets should be deducted. In some of the cases it was held that securities in a sinking fund, the nature of which securities does not appear in the reports, should be so deducted. No reason can be perceived why the doctrine of these decisions should not be applied in the case of municipal sinking funds invested in bonds other than the bonds of the municipality, as, for illustration, in Liberty bonds.

The special fund pledged for the payment of the proposed bonds of Greenville County or of the Road District of Greenville County are really sinking funds. They should be deducted from the gross amount of the bonded debt of the county or road district in computing the net debt subject to the costitutional limitations. If an obligation of the United States, evidenced by a Liberty bond, held in the sinking fund of a municipality, should be deducted from the gross debt of the municipality in computing its net bonded debt, why should not the obligation of the State of South Carolina, evidenced by the reimbursement agreements in question, pledged for the payment of the bonds in question, be deducted from the gross bonded debt of the county or road district in computing the net bonded debt, subject to the constitutional limitations?

It cannot be argued that the State does not differ from an individual, and the fact that an individual has assets to pay his debts does not reduce his debts. Such an argument loses sight of the fact that in the case of sinking funds the cash or securities in the fund are pledged to the redemption of bonded debt, and cannot legally be diverted from that purpose.

Is the Act of March 23, 1926 (34 Stat. at Large, p. 1534) designated in the petition as the Greenville Bond Act, in conflict with the Subdivision 9 of Section 34 of Article 3 of the Constitution of South Carolina, prohibiting the enactment of special laws in a case where a general law can be made applicable?

The subject of the Greenville Bond Act is not one of the subjects specified in Section 34 of Article 3 of the Constitution, as to which special legislation is prohibited by that section. The only question is whether the Act falls within the provision that "in all other cases where a general law can be made applicable, no special law shall be enacted."

It is settled by the decisions of this Court that a special Act authorizing a county or other political subdivision to issue bonds is not within the consti-

tutional prohibition. *Sullivan v. City Council of Charleston* (S. C.), 130 S. E., 876. *City of Columbia v. Smith,* 105 S. C., 348; 89 S. E., 1028.

The Civil Code contains general provisions authorizing counties to issue bonds for certain purposes. The Act in question should be sustained as an amendment to the general law incorporating special provisions therein. *Carolina Grocery Co. v. Burnet,* 61 S. C., 205; 39 S. E., 381; 58 L. R. A., 687.

Is the Act of April 2, 1926, designated in the petition as the General Bond Act, in conflict with Subdivision 9 of Section 34 of Article 3 of the Constitution of South Carolina, prohibiting the enactment of special laws in a case where a general law can be made applicable?

What we have said above in regard to the constitutionality of the Greenville Bond Act applies to the General Bond Act.

Is said General Bond Act unconstitutional upon the ground that it creates incorporated road districts, and that the sections of the Constitution of South Carolina which recognize and adopt certain specified political subdivisions for purposes of local government by implication prohibit the creation of incorporated road districts?

The constitutionality of statutes creating road districts has been repeatedly sustained against various objections in many States. 29 C. J., 554. In this State bridge districts, which are really highway districts, have been created by the General Assembly, such as the Santee Bridge District (31 Stat. at Large, p. 1409), the Savannah Bridge District (31 Stat. at Large, p. 1395), and the Clarendon and Orangeburg Bridge District (33 Stat. at Large, p. 1593), some of which have issued large amounts of bonds, and the power of the General Assembly to create such districts has not been questioned. The constitutionality of such legislation was assumed in *Bagnall v. Clarendon and Orangeburg Bridge District,* 131 S. C., 109; 126 S. E., 644.

The petitioner maintains that the creation of such districts is impliedly forbidden by Section 5 of Article 10 of the Constitution, which declares that the corporate authorities of counties, townships, school districts, cities, towns, and villages may be vested with power to assess and collect taxes for corporate purposes. This provision has nothing to do with the creation of political subdivisions or public or *quasi* public corporations; it relates only to taxation. The real question is, therefore, whether or not the corporate authorities of a road district may be given the power to assess and collect taxes on property in the district for the purposes of the district.

A similar question arose in *Jackson v. Breeland,* 103 S. C., 184; 88 S. E., 128, where it was held that a drainage district could be created and given the power to levy special assessments according to benefits. The decision was placed upon the ground that the words "taxes for corporate purposes" in Section 5 of Article 10 of the Constitution means "taxes for general revenue or governmental purposes," as distinguished from "assessments for local improvements." The tax authorized to be levied in the Road District of Greenville County may be sustained upon similar grounds. It is a tax for a special purpose.

The New York case, cited by the petitioner (*People v. Becker,* 203 N. Y., 201; 96 N. E., 381) was decided upon the peculiar provisions in the New York Constitution, which guarantee to political subdivisions a certain measure of home rule. No similar provisions are to be found in the Constitution of South Carolina. The New York case was declared to be "of doubtful authority" in *Harris v. William R. Compton Bond, etc., Co.,* 244 Mo., 664; 149 S. W., 603, where the subject is discussed at length and a different conclusion was reached.

Is said Pay-As-You-Go Act in conflict with Section 17 of Article 3 of the Constitution of South Carolina, upon the ground that the provisions of said Act

relating to the levying of a gasoline tax and an automobile license tax are not embraced in the subject expressed in the title of said Act?

The words "and to provide funds," in the title of the Pay-As-You-Go Act, are broad enough to indicate that the body of the Act provides for the levy of gasoline taxes and automobile license taxes. It is not necessary that the title should be an index of the contents of the statute.

If the title was defective, the defect was remedied by the Amendatory Act of March 23, 1925 (34 Stat., 51), the title of which expressly stated that its purpose was "to reduce the licenses of automobiles and increase the tax on gasoline."

Are the provisions of said Pay-As-You-Go Act providing for the levy of a gasoline tax and an automobile license tax in conflict with Section 5 or 6 of Article 1 or Section 1 of Article 10 of the Constitution of South Carolina, or the Fourteenth Amendment to the Constitution of the United States?

The constitutionality of automobile license taxes, gasoline taxes and similar taxes have been sustained so often that we will not dwell at length upon this objection. Among the cases in point are *Lillard v. Melton,* 103 S. C., 10; 87 S. E., 421. *Standard Oil Co. v. City of Spartanburg,* 66 S. C., 37; 44 S. E., 377. *Charleston Oil Co. v. Carter,* 131 S. C., 466; 128 S. E., 8. *State v. Touchberry,* 121 S. C., 5; 113 S. E., 345. See, also, *Sonneborn Bros. v. Cureton,* 262 U. S., 506; 43 S. Ct., 643; 67 L. Ed., 1095.

The judgment of this Court is that the injunction prayed for be refused, and that the petition be dismissed.

MESSRS.. JUSTICES WATTS, BLEASE, and STABLER, and MR. ACTING ASSOCIATE JUSTICE C. J. RAMAGE concur.

MR. CHIEF JUSTICE GARY did not participate.