HENDRICKS, ET AL. v. SCHOOL DIST. No. 1, ET AL.
(No. 1736; May 3, 1932; 10 Pac. (2d) 970)

For the appellant there was a brief and oral argument by *E. J. Goppert,* of Cody, Wyoming.

For respondents there was a brief by *T. F. Shea* and *Paul R. Greever,* of Cody, Wyoming, and oral argument by *Mr. Greever.*

BLUME, Justice.

This is an action brought by taxpayers of School District No. 1 of Park County, Wyoming, to contest the validity of bonds of the district, proposed to be issued pursuant to a vote of the people. The trial court rendered judgment for the defendants and the plaintiffs have appealed.

The questions raised on this appeal relate to the notice given and to the amount of bonds authorized to be issued. The election was held on January 31, 1931, and the proposition submitted was whether or not the district should issue bonds in the sum of $70,000 for the erection of a schoolhouse and to furnish the same. The proposition was carried by a vote of 636 as against 532. A total vote of 1138 was cast as opposed to a total vote of 1140 cast in the general election in November, 1930. Notice of the election was printed in a newspaper, published in the district, about thirty days prior to the time of the election, and notices were posted on January 17, 1931. The evidence is not altogether clear as to how many notices were posted. Two were posted in the town of Powell and one in the town of Garland. The evidence of the witness Graham tends to show, and he stated positively in two different places, that notices were

posted on every school house in the district. If that is correct, eight to ten notices were posted in the district. The testimony of the witness, however, is somewhat contradictory, and the contradictions were not cleared up. A considerable amount of evidence was introduced that the election was the general subject of conversation among the voters in the district for two or three weeks before it was held; that a newspaper contained articles in reference thereto and that mass meetings were held. It was admitted in open court by the plaintiffs "that the bond election was the topic of conversation on Powell Flat (namely, in the district in question) during the time shortly before the election and that not over a dozen or two could be found that did not know of the election." One of the notices posted in the town of Powell was in the window of one D. M. Baker. This notice stated that the polls would be open from seven o'clock in the morning until seven o'clock in the evening, while the other notices posted stated that the opening hour would be nine o'clock. It appears that the judges and clerks of election at Powell were at the voting place about 8:30 o'clock in the morning. The janitor testified that he arrived at that place at 7:30 in the morning and that no one was there at that hour and that the first persons to arrive after him were the judges and clerks of election. So far as appears from the record, no one attempted to vote prior to nine o'clock in the forenoon.

The defendant district is a consolidated district of three older districts, namely one at Powell, one at Garland, and an old district numbered 25 in territory west of Powell and Garland, and which latter district had at one time been a part of the Powell district but had been separated therefrom in 1917. Number 25 and the Powell district were consolidated on March 29, 1922, and the Garland district was consolidated with them on June 7, 1922. At the time of the consolidation there were outstanding against the Garland district, bonds amounting to $9000, and against the Powell

district, including those that were issued when it was combined with No. 25, as well as those when it was separated therefrom, bonds amounting to $89,150, making the total outstanding bonded indebtedness against all of the territory included in the consolidated district $98,150. There was in the sinking fund at the time of the election as against the bonds issued by the Garland district, the sum of $1678.41, and as against the bonds issued by the Powell district the sum of $8020.84, making a total in the sinking fund, which amount was kept separate and distinct, the total sum of $9699.25, making the net indebtedness, after subtracting the sinking fund, the sum of $88,450.25. The assessed valuation in the district was as follows: In the Garland district, $1,112,839; in the old Powell district, $2,823,406; in the old district No. 25, $620,050, making a total assessed valuation in district No. 1 of $4,556,295, two percent of which would be $91,125.90, leaving, after subtracting the net indebtedness as above stated, the sum of $2675.65 which might have been issued by the district without exceeding 2% on the assessed valuation. The school board originally adopted a resolution to expend the sum of $1400 for desks, black-boards and lockers, and the balance for the erection of a building. This amount of $1400 was subsequently reduced by action of the board to about the sum of $600.

1. Appellants contend that the notices given were insufficient making the election void, not only on account of the irregularity in case of the notices as to the opening hour above mentioned, but also because no copies of the election notice were furnished to the teachers in the district. This court has on two previous occasions held that a substantial compliance with the law as to the giving of the notice is sufficient. Cheyenne v. State ex rel. Rollins, 17 Wyo. 90, 96 Pac. 244; First National Bank v. City of Laramie, 25 Wyo. 267, 168 Pac. 728. And we doubt that the mistake in stating the opening hour in one of the notices is of importance, in view of the fact that the record affirmatively shows that

no voters were hindered in casting their votes at the election by reason of that mistake. It is admitted in the record that no copies of the notice were furnished to the teachers. That requirement was made in Section 2294, Wyo. C. S. 1920, which reads as follows:

"The district clerk shall give ten days previous notice of all regular and special meetings of the district, herein authorized, by posting up a written notice in three different places therein; and shall furnish a copy of the same to the teachers of each school in the district, to be read once in the presence of the pupils thereof."

In 1923, the legislature by Section 7, Ch. 19, of the session laws of that year, amended that law to read as follows:

"The district clerk shall give ten days previous notice of all regular and special meetings of the district, herein authorized, by posting up a written notice in three different public places therein."

It is not questioned that, aside from the irregularity in one of the notices as to the opening hour, the notices prescribed by this amendment were properly given, but it is contended that the amendment of 1923 was not properly adopted, leaving the provision of the previous law, namely, that copies of the notice should be furnished to the teachers in the district, in force and effect. We think, however, that, whatever might be said as to the importance of that provision, it is not necessary to pass upon the point raised, because of the admission in court that there were not over a dozen or two persons in the district who did not know of the election. This, in view of the majority by which the bonds were carried, was substantially equivalent to an admission that irregularities in the election notices did not affect the result. It is said in Dillon, Municipal Corporations, 5th Ed., Sec. 374, that

"It is a canon of election law that an election is not to be set aside for a mere informality or irregularity which cannot be said in any manner to have affected the result of the election."

In Williams v. Glover, (Tex. Civ. App.) 259 S. W. 957, 961, the court said in reference to an irregularity in giving the election notice:

"It was admitted that every one of them (the voters) had actual knowledge of the time, place, and purpose of the same. It is not shown, nor even contended, that any voter failed to participate in the election because of any irregularity in said notices. Approximately one-half the total number of voters actually participated. The vote in favor of the tax was nearly two to one. We do not think the irregularity shown was sufficient to affect the validity of such election."

In Hill v. School District, (Tex.) 251 S. W. 209, 211, it was said as to irregularities in such elections:

"The rule is that the statutes regulating the manner of holding an election are merely directory, and a departure from their provisions will not, ordinarily, invalidate an election, unless such departure or such irregularity have affected or changed the result of the election."

In the case of King v. Independent School District, 46 Ida. 800, 272 Pac. 507, 510, the court said:

"The election having been held, the statutes regulatory thereof will be held to be directory unless it appears that the failure to give proper notice has affected the result of the election." Citing a number of cases.

Many more cases expressing the same thought might be cited, but that is not necessary. The cases on which appellants rely are distinguishable. In fact, one of them, namely, State ex inf. Brown v. Sengstacken, 61 Or. 455, 122 Pac. 292, 297, Ann. Cas. 1914 B, 230, sustains the rule stated, at least to some extent, the court saying:

"When, however, from an inspection of the number of votes cast in a precinct at a special election, when compared with the number of registered voters therein at that time, it conclusively appears that no different result could have been possible in the entire district affected by the majority vote, the failure strictly to comply with the requirements of the statute in respect to giving notice will not invalidate the election."

We cannot, accordingly, hold that the foregoing irregularities invalidated the election. And we might add that in view of the foregoing admission made by plaintiffs, the objection to the action of the trial court in letting in evidence to show that the voters of the district knew of the election, becomes immaterial herein.

2. It is urged by appellants that the money in the sinking fund, for the retirement of bonds, should not be taken into consideration in determining the amount of the existing indebtedness against the district. The case of Angola etc. Co. v. School Board, 73 Ind. App. 557, 127 N. E. 855, is relied upon. That case does not seem to be in point, since it does not, apparently, refer to money in a sinking fund for bonds. Section 99-1006, Rev. St. 1931, provides that an annual tax shall be levied by the board of county commissioners of the proper county for the purpose of paying the interest and creating a sinking fund to retire the bonds issued by a school district, and in Section 99-1011, the county treasurer is made the custodian of such funds, and the rule seems to be uniform that money in a sinking fund is a proper off-set as against existing bonds in payment of which such money is pledged. 6 McQuillin, Mun. Corp., (2nd Ed.), Sec. 23, p. 97; Williamson v. Aldrich, 21 So. Dak. 13, 108 N. W. 1063; First National Bank v. Jackson, 199 Ky. 94, 250 S. W. 795; Briggs v. County, 137 So. Car. 288, 135 S. E. 153, 161; Reynolds v. School District, 90 Ok. 261, 217 Pac. 166, and cases cited; 56 C. J. 539.

3. The question submitted to the voters was, as already indicated, whether or not bonds to the amount of $70,000 should be issued "for the purpose of providing funds for the erection of school buildings within the district * * * and providing the same with the necessary furniture." It is contended by appellants that, since part of the money was to be used for furniture, the district could not issue bonds which, together with the existing bonds, exceed 2% of the assessed valuation, namely, the sum of $91,125, whereas the proposed bonds added to the indebtedness already existing would exceed that amount considerably. Section 5 of Art. 16 of the Constitution, prior to an amendment adopted in 1920, provided that no subdivision of any county should in any manner create an indebtedness exceeding 2% of the assessed valuation of the taxable property therein. By an amendment to that section adopted in 1920 it was provided as follows:

"Provided further, that any school district may be authorized to create an additional indebtedness, not exceeding 4 per centum on the assessed value of the taxable property therein as shown by the last preceding general assessment, for the purpose of the erection or enlargement of school buildings therein."

It will be noted that this amendment makes no direct mention of furniture. The legislature, by Ch. 149, S. L. 1921, passed an act enabling the board of school trustees of any district to issue bonds in conformity with this amendment, following the language of the constitution. Prior to that time it had been provided by Section 2365, C. S. 1920, now Section 99-1001, Rev. St. 1931, that the board of school trustees of any district should (pursuant to an election) have the right to issue bonds in an amount not exceeding 2% of the taxable property in the district "for the purpose of building school houses in the district, *and providing the same with necessary furniture,*" and it is contended, that in view of the fact that the italicized portion of the section

last mentioned was left out of the amendment to the constitution and the law passed pursuant thereto, no money realized from bonds exceeding two percent of the taxable property in the district can be used for furniture. There is a conflict in the authorities on that point. Grabe v. School District, 53 S. D. 579, 221 N. W. 697, seems to sustain that contention. The reasoning in other cases would lead to the contrary conclusion.

In the case of Board v. Malone & Co., 179 N. C. 110, 101 S. E. 552, 553, it appears that the power granted to a school board was to erect buildings, without mentioning furniture. It was held that the power to pay for ordinary equipment should be implied. It was said in part:

"As now advised, we incline to the opinion that, where power is conferred on a municipal board in charge of the matter 'to raise the means and erect a new building' for school purposes, it should be held to include the right to procure and pay for the ordinary equipment. As we understand it, such an expenditure would be chiefly for seats and desks for the pupils, usually fastened to the floor, after the manner of fixtures, and necessary to the proper use and enjoyment of such a building."

In the case of Hudgins v. School District, 312 Mo. 1, 278 S. W. 769, 771, it appears that the power granted to a school district was for the erection of buildings, without referring to furniture or equipment. The court in that case, too, held that the power to erect a building includes the power to equip it, saying:

"It has often been held here and elsewhere, not only in the construction of statutes, but Constitutions, that they should be so construed as to aid and effectuate the purpose of their adoption. This beneficent and wholesome rule would cease to be applicable if the section be construed as contended by appellants. It would authorize the erection of a building, but leave it empty as the House of Usher, and thus defeat the purpose of its erection. Goode, J., in an illuminating opinion in State ex rel. Wahl v.

Speer, 284 Mo. 45, 223 S. W. 655, held, in effect, that the language of the Constitution (Section 11, Art. 10), which authorizes an increase in the indebtedness of a county for the erection of a courthouse, means, not only that the money so voted can be used to construct the courthouse, but also to acquire a site for it; the rule of interpretation being that a power granted carries with it, incidentally or by implication, powers not expressed, but necessary to render effective the one expressed, and that a courthouse cannot be erected without a site. By parity of reasoning, while a school building may be erected without equipment, the latter is vitally necessary to its use, and without the same its erection would be futile and the purpose of its erection a useless formality.''

In Maxcy v. Oshkosh, 144 Wisc. 238, 128 N. W. 899, 912, 1136, 31 L. R. A. (N. S.) 787, the court said on a similar question:

''The statute under which the bonds we are considering were voted authorized the city to vote bonds 'for the erection, construction, and completion' of school buildings. The question is, Are bonds voted to *build* and *equip* a manual training school voted to *build* and *complete* such a school? Is a school building complete within the meaning of the statute before it is provided with seats, desks, blackboards, and other necessary paraphernalia? Is it complete before it is ready for occupancy for school purposes? Is a manual training school complete before it is supplied with the necessary lathes, benches, and other equipment to carry on manual training work? Is a city permitted to raise money by a sale of bonds to erect a school building, but prohibited from voting enough to seat the building after it is erected? The word 'completion' found in the statute must be given some force, unless we say it was intended to be used as synonymous with the words 'erection' and 'construction.' In principle we see no good reason why bonds may not be issued to equip a school building after it is built as well as to erect the building itself, and it cannot well be said that a school building is complete until it is ready for use and occupancy.''

Power to erect a school house should ordinarily, doubtless, be held to include power to put into it the necessary equipment, such as desks, boards, etc., just as much so as a heating plant. The only doubt that arises is by reason of the difference in the language of the amendment to the constitution above mentioned, and the law passed pursuant thereto, and the language of the law previously existing. But even though it should be held that by reason of this difference, the constitutional amendment and the law passed pursuant thereto, do not contemplate that the bonds issued thereunder can be used for equipment, that fact would not, in view of the facts in this case, be at all controlling herein. Counsel argue that because the proposition submitted to the vote of the people included a contemplated expenditure for "furniture," the total bond issue is by reason of that fact necessarily limited to the two per cent mentioned. We are unable to follow the logic of that. That would be putting form above substance. The constitution and the laws permit school districts to issue bonds up to six per cent of the assessed valuation when the money is to be used to erect school buildings. All except $600 of the bonds proposed to be issued are to be used for that purpose. The laws also permit such districts to issue bonds up to two per cent of the assessed valuation for the purpose of buying equipment and furniture—at least when bought in conjunction with the erection of a building. In the instant case about $2600 was available without exceeding the two per cent limit, and we cannot see why $600 or $1400 of that amount cannot be used for furniture,—i. e., the equipment contemplated by the board—without in any way violating the constitution or the laws. The only possible point that might be urged in this connection would be that the proposition to issue bonds for "furniture" should have been submitted to the people separately from that relating to the issuance of bonds for the erection of a school building, so as to have given the voters

an opportunity to express themselves separately on these points. But no objection like that has been raised herein, and we need not say what, if any, force such objection would have.

4. It is contended by appellants that the bonds previously authorized and issued by the component parts of the consolidated district prior to the consolidation remain a burden upon the respective component parts. We are unable to perceive how that question is material in the instant case. We have been cited to several cases holding that where the indebtedness of any component part of a consolidated district exceeds the constitutional and statutory limit the bonds voted are void. Among the cases cited are Mistler v. Eye, 107 Okl. 289, 231 Pac. 1045; Cheek v. Eye, 96 Okl. 44, 219 Pac. 883; and Ikard v. School Dist., 101 Okl. 80, 223 Pac. 141. These cases, of course, would be applicable if the indebtedness of any of the component parts of the consolidated district in the case at bar would exceed the constitutional and statutory limit of 6%, but we are unable to perceive how it has any bearing in this case, and it is accordingly unnecessary to decide it.

Finding no error in the record, the judgment of the District Court must be affirmed and it is so ordered.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.